**UNITED STATES of America, Plaintiff–Appellee,**

**v.**

**Betty KLADOURIS, Defendant–Appellant.**

**No. 90–3540.**

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1991.

Decided May 20, 1992.

Edward G. Kohler, argued, Office of the U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.

Patrick A. Tuite, argued, Chicago, Ill., for Betty Kladouris.

Before COFFEY, FLAUM and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Betty Kladouris appeals her conviction for arson in violation of 18 U.S.C. § 844(i), conspiracy to commit arson in violation of 18 U.S.C. § 371, and knowingly and wilfully making false statements to a government agent in violation of 18 U.S.C. § 1001.[1] We affirm.

---

1. The relevant portions of the statutes provide:

"§ 844. Penalties

....

(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both...."

"§ 371. Conspiracy to commit offense or to defraud United States

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

"§ 1001. Statements or entries generally

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

## I. FACTS

In 1985 the appellant and her husband, James Kladouris, were the owners of the Honey Bee Restaurant in Burnham, Illinois. At approximately 10:20 p.m. on November 11, 1983, a police officer observed a fire at the restaurant and contacted the Burnham Fire Department. Fire fighters upon arrival discovered and extinguished a fire in the restaurant storeroom. Samples of cardboard as well as paper retrieved from the storeroom and submitted to a forensic chemistry expert were found to contain traces of a mixture of two distillates, petroleum naphtha[2] and fuel oil; thus, the investigators concluded that the fire was purposefully set.

Following the fire, the defendant was interviewed by a special agent of the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") assigned to the arson profits squad. Kladouris informed the agent that she was alone in the restaurant after the last waitress had departed around 9:45 p.m., and upon securing the doors, she locked up at 10:00 p.m. In addition, she related that none of the restaurant's bills were overdue except for a disputed water bill. The investigation revealed that two men (Kladouris' brother, Sam, and an unidentified friend) were with Kladouris when the waitress left. The investigators further determined in contradiction of the defendant's statement that many of the Honey Bee's bills were in arrears and had been in arrears for some time prior to the date of the fire. On January 30, 1990, a grand jury returned a four-count indictment, charging Kladouris with arson, conspiracy to commit arson, making false statements to a federal agent and mail fraud.[3]

At trial, the government introduced testimony from three expert witnesses to establish that the fire was the result of arson. An electrical engineering expert testified that on the basis of his own inspection of the restaurant premises, there was no electrical malfunction present that could have caused the fire to ignite; a forensic chemis-

try expert who analyzed the samples of cardboard and paper retrieved from the storeroom testified that they contained a combination of fuel oil and petroleum naphtha, which together would cause a hot fire almost instantaneously after being ignited; and a cause-and-origin arson expert, who examined the scene of the fire, testified that on the basis of his own investigation as well as the testimony of the other two experts, he believed the fire was "purposely set with the intention of burning property." The cause-and-origin expert further testified that the pattern in which the fire burned, an inverted "V", evinced that the fire was deliberately started with the use of an "accelerant" because normal fires begin small at the base and spread out as they go up rather than wide at the base with a narrow apex. The defendant attempted to rebut the government's expert with an alleged expert who would have testified: a) that the presence of distillates does not always indicate arson; b) that a "V" burn pattern fails to demonstrate that a fire was deliberately started; and c) that the fire could have been caused by spontaneous combustion due to the presence of dirty aprons and towels contaminated with grease and fats in a laundry bag in the storeroom. The court excluded the evidence, ruling 1) that the witness failed to possess the qualifications, training or knowledge required to express an opinion to a reasonable degree of certainty concerning the significance of the presence of distillates and hydrocarbons in the cardboard and paper from the storeroom; 2) the testimony about the burn pattern would be speculation, since the witness had never seen an inverted "V" burn pattern nor did he personally investigate the fire; and 3) there was an inadequate factual basis for a conclusion that spontaneous combustion may have occurred.

In demonstrating the defendant's motive for torching the restaurant, the government introduced evidence of the financial difficulties the business was experiencing.

---

**2.** Petroleum naphtha includes such commercial products as lantern fuels, camping stove fuel, motor gasoline and white gas.

**3.** The mail fraud count was later dismissed at the request of the government.

Witnesses testified that the Honey Bee accounts were significantly in arrears with food suppliers as well as utilities. The testimony of an employee of the defendant's bank revealed that during the five months prior to the fire, the defendant wrote eighteen checks on the Honey Bee account returned by the bank for insufficient funds. The government introduced in evidence the restaurant's lease and insurance policy in order that they might demonstrate the financial benefit that might accrue to Mr. and Mrs. Kladouris if the restaurant were to be destroyed by fire. The language in the lease provided that it could be terminated after a fire, and the insurance policy provided for the $76,000 in coverage for property damage and lost wages that Mr. Kladouris ultimately claimed as a result of the fire.[4]

The government established Kladouris' opportunity to commit the arson or participate therein through a number of factors. There was no evidence of a break-in at the restaurant, and from the defendant's own testimony, it is evident that she departed only six minutes before the fire became so intense that it melted the minute hand of a clock in place at 10:06 p.m. A neighbor who observed the defendant's brother Sam and his friend in the restaurant while eating dinner there on the evening of the fire testified that while he was in his parents' backyard within view of the Honey Bee Restaurant, he observed Sam or his associate walk out of the restaurant about 10:00 p.m., get a paper bag out of the defendant's white Cadillac, and return with it to the restaurant. Additionally, over the objection of the defendant, the government introduced the grand jury testimony of another witness (Stanley Wadas) who was unavailable because he died before trial.

Wadas' earlier grand jury testimony recounted that at 10:05 p.m. on the night of the fire he was in his T.V. room (facing the rear of the restaurant and its parking lot) watching the news. At this time he noticed the defendant's (Betty Kladouris') white Cadillac in the parking area where she customarily parked it, and several minutes later, he noticed that the white Cadillac had been moved to the front of the restaurant. At about this same time, he observed a man run out of the Honey Bee and jump into the passenger side of the white Cadillac as the car drove off. At trial the defendant testified that after the last waitress left at 9:40 p.m., she was alone in the Honey Bee, and that prior to leaving she checked the restaurant premises but did not go into the storeroom. She further stated that when she left the restaurant that evening she did not have a passenger riding with her in her car, nor was her brother Sam at the Honey Bee on the day of the fire.[5] Further, the defendant denied setting the fire or telling anyone else to torch the restaurant. The jury, judging the credibility of the witnesses, chose not to believe her testimony and found her guilty on one count of arson, one count of conspiracy to commit arson and one count of making false statements to a federal agent. The trial court imposed two four-year terms of imprisonment on the defendant for the arson and conspiracy to commit arson counts, and a three-year term of probation on the false statement count, all to be served concurrently. The incarceration was stayed for one year because of problems with the health of the defendant's daughter. The court also imposed a fine of $2,000 and special assessments in the amount of $150.

**4.** The attorney representing the defendant was also representing Mr. Kladouris in the civil suit against the insurance company. Before jury selection, the trial judge questioned the defendant closely about whether she understood the possible conflict of interest that the attorney might have in the event that she were to determine that it would be in her best interest to plead guilty, since the same attorney was representing her husband, Mr. Kladouris, on a contingency basis in his claim for the insurance coverage proceeds. The defendant in response to detailed interrogation made it clear that she was unwilling to plead guilty under any circumstances and requested that her present attorney continue to represent her despite the possibility of a conflict of interest.

**5.** Three witnesses testified that the defendant, Betty Kladouris, approached them after the fire and asked them not to mention that Sam was present at the restaurant that evening.

## II. ISSUES FOR REVIEW

The appellant raises the following issues: 1) whether the trial court's admission of the grand jury testimony of a deceased witness in evidence violated the hearsay rule and the defendant's Sixth Amendment Confrontation Clause rights; 2) whether the trial court erred by refusing to admit evidence of a post-fire conversation between the restaurant's landlord and the defendant's husband; 3) whether the trial court erred in admitting the restaurant's lease and insurance policy as evidence of the defendant's motive; 4) whether Kladouris received ineffective assistance of counsel as the result of the alleged conflict of interest (raised for the first time on appeal) arising from her own trial counsel's representation of her husband on a contingency fee basis in an action to recover insurance proceeds from the fire; 5) whether the trial court erred in giving the conscious avoidance or "ostrich" instruction along with aider and abettor instructions; and 6) whether the trial court improperly refused to allow the defendant's fire expert to testify.

## III. GRAND JURY TESTIMONY

The trial court admitted in evidence the grand jury testimony of Stanley Wadas, a deceased witness, under Federal Rule of Evidence 804(b)(5).[6] Wadas testified as follows:

Q. "[D]id you see through your window while you were watching the news Betty Kladouris' white Cadillac parked in the restaurant parking lot?

A. Yes, it was parked in the back right by the alley. She always parked it there.

Q. So it was in the stall of the parking lot near the alley?

A. Yes, sir.

Q. Close to your property?

A. Yes.

Q. And some minutes later did you notice by looking at the window that the white Cadillac was in front of the restaurant facing the restaurant?

A. That's right.

Q. And you could see the back door?

A. The back of the car and half of the door.

Q. Generally does the restaurant close about 10 p.m.?

A. 10 o'clock, yes.

Q. Mr. Wadus, [sic] after you noticed the car parked in front of the restaurant after it had been moved, did you notice a man dressed in dark pants and a white short coat go into the car on the passenger side?

A. Yes. I happened to look that way, and I seen the fellow running out of the restaurant. And all I could see was the back of him.

Q. And you saw him get into the car?

A. He got into the car, yes.

Q. And then he got into the passenger side of the car?

A. Yes.

Q. And then you saw the car drive away in a westerly direction?

A. That's right.

---

6. **"Rule 804. Hearsay Exceptions; Declarant Unavailable**

. . . .

**(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

**(5) Other exceptions.** A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant."

The appellant does not challenge the court's determination that elements (A), (B) and (C) have been met.

Q. Generally on the occasions when you have seen Betty Kladouris drive the car away, does it go in the opposite direction?

A. She does. She backs up and comes back to Calhoun. She either goes south straight or else she goes to Torrence.

Q. So was it unusual for this car to go in the direction you saw it go in?

A. Yes.

Wadas' testimony contains only one statement that was uncorroborated by other witnesses and thus "more probative on the point for which it [was] offered than any other evidence which the [government could] procure through reasonable efforts." Rule 804(b)(5)(B). Shortly after 10:05 p.m., Wadas observed a man run out of the restaurant and enter the passenger side of the defendant's car, which was then driven away in a direction different from the course of travel the defendant generally used as she departed from the restaurant.[7] The defendant claims (on appeal) that the lack of an opportunity to cross-examine this witness made this testimony unreliable under both 804(b)(5) of the Federal Rules of Evidence and the Sixth Amendment.[8]

■ We review a district court's rulings on the admissibility of evidence under an abuse of discretion standard. *United States v. Snyder*, 872 F.2d 1351, 1354 (7th Cir.1989). Moreover, the district court is afforded "considerable discretion, within the parameters of the Rules of Evidence, in determining whether the hearsay statements contain the necessary circumstantial guarantees of trustworthiness." *United States v. Vretta*, 790 F.2d 651, 659 (7th Cir.1986).

"The factors that should be considered by the district court in assessing the trustworthiness of hearsay testimony include:

the character of the witness for truthfulness and honesty, and the availability of evidence on the issue; whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; the witness' relationship with both the defendant and the government and his motivation to testify before the grand jury; the extent to which the witness' testimony reflects his personal knowledge; whether the witness ever recanted his testimony; the existence of corroborating evidence; and, the reasons for the witness' unavailability.

This list of factors is neither exhaustive nor absolute, and each case must be analyzed on its own facts."

*United States v. Doerr*, 886 F.2d 944, 955–56 (7th Cir.1989) (quoting *United States v. Snyder*, 872 F.2d 1351, 1355–56 (7th Cir. 1989)).

■ The trial judge's ruling reveals that he "analyzed [this case] on its own facts":

---

**7.** The defendant testified that on the evening of the fire she drove her car to the front of the restaurant and left it there before 9:30 p.m. She maintained that she entered the car at the driver's door when she left at 10:00 p.m., and that no one else was in the car.

**8.** The appellant states that the core of her argument is not that the grand jury testimony was unreliable because the witness was lying, but that it is unreliable because the lack of cross-examination prevented the defendant from testing the accuracy of the witness' perceptions. The appellant's reliance upon the eye-witness identification cases for the proposition that she must be allowed an opportunity to test the accuracy of the witness' grand jury testimony is misplaced, since Wadas did not purport to identify the individual who ran from the restaurant to the car. The appellant has failed to cite, and we are unaware of, any case excluding otherwise admissible hearsay evidence because of the defendant's lack of opportunity to test the *accuracy* thereof through cross-examination. Furthermore, the defendant failed to object to the accuracy of the witness' statements as a ground for exclusion before the trial judge. Thus, we review this issue under a traditional hearsay and Confrontation Clause prospective. We note that if the defendant had desired to challenge the witness' ability to make the observation he detailed in his testimony, she might conceivably have done so through submitting evidence as to the measurements of Wadas' window, the portion of the restaurant that is visible through it and the lighting conditions in Wadas' apartment as well as in front of the restaurant. (The appellant does not challenge the district court's finding that the defendant failed to establish a proper foundation for the introduction of the photographs she submitted in an attempt to controvert Wadas' testimony.)

"It seems quite clear to me that if any testimony of a deceased grand jury witness ought to be introduced in evidence, this is really that case. There is nothing about the relationship of this particular witness to the defendant that indicates anything but the statement of a disinterested witness.

"The degree to which this witness made observations, the witness' statements I think carry a substantial ring of truth. There's nothing about the nature of the testimony that shows that he was in any way out to get this particular defendant or anybody associated with this particular defendant.

"The absence of identifications of the defendant as such to me is highly probative. There is an inherent trustworthiness in considering what this witness observed and the viewpoint from which he observed it, that he said only those things which he could reliably observe from where he was. The witness is not and was not an accomplice. The witness is not subject to prosecution for anything. The government had no leverage on the witness. And much of what the witness has to say is corroborated by other evidence.

"There is the circumstantial support for what the witness has to say. I think that there is with respect to this particular witness in this particular case more than the necessary showing of reliability, and I regard the required showing of reliability as quite rigorous. And I think that this witness meets all of the tests."

We agree with the trial judge's ruling that the statements of the deceased witness contain the necessary guarantees of trustworthiness. The appellant's primary contention is that the testimony is unreliable only because Wadas was never subjected to cross-examination. Since grand jury witnesses are never cross-examined, and the law permits the admission of such testimony when it complies with the requirements of Rule 804(b)(5), the lack of cross-examination is immaterial. Kladouris' speculation that Wadas may have been biased (and that cross-examination could have exposed the bias) is unsupported in the record. She has failed to establish any proof of bias through other witnesses much less a reason for bias. Moreover, the fact that one item in Wadas' testimony was uncorroborated goes merely to the weight of the evidence, not its reliability. If every word of the testimony were corroborated, there would be no necessity for it, and it might not meet the 804(b)(5)(B) requirement that it be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." The appellant has not only failed to persuade us that the trial court abused its discretion, but likewise has failed to persuade us to rule differently.

Kladouris argues that the admission of Wadas' grand jury testimony violated her Sixth Amendment Confrontation Clause rights because it "is unreliable under the Sixth Amendment for the same reasons it is unreliable under Rule 804(b)(5)." Since the quoted language is the extent of the appellant's Confrontation Clause argument, our holding under Rule 804(b)(5) that the testimony was sufficiently reliable is decisive on this issue. Furthermore, "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991).

## IV. EXCLUSION OF POST–FIRE CONVERSATION

Some sixty days after the fire, the property owner allegedly advised Jim Kladouris that he planned to rebuild the restaurant and hold the Kladourises to the terms of the lease. In response, Jim Kladouris purportedly informed the owner that he wanted the restaurant rebuilt because it was his intention to re-open the Honey Bee. The appellant argues that the court erred in excluding this testimony because it would have demonstrated that her husband viewed the fire as an accident, thus undermining the government's evidence that she had a motive to burn the restaurant. She contends that her husband's "innocent knowledge and motive ... should have

been imputed to [her]...." We disagree and fail to understand how the defendant's husband's state of mind two months after the fire is relevant to establish the defendant's motive at the time of the fire. Furthermore, under the circumstances, Jim Kladouris' state of mind in January is immaterial because the defendant failed to argue to the trial judge that the testimony was being elicited to establish her husband's state of mind. In cross-examining the owner, the defense attorney asked whether he had spoken face to face with the defendant's husband:

"[OWNER]: I believe so, yes.

[DEFENSE COUNSEL]: And what did you say to him and what did he say to you?

[PROSECUTOR]: Objection, Judge, hearsay.

THE COURT: Objection is sustained.

[DEFENSE ATTORNEY]: If the Court please, that certainly wouldn't be hearsay.

THE COURT: It is clearly hearsay. The objection is sustained."

Defense counsel was even less specific in attempting to persuade the judge to overrule the government's objection to similar testimony from the defendant's husband:

"[DEFENSE COUNSEL]: Now, did you ever have a conversation with [the building owner] after November 11, 1985?

[DEFENDANT'S HUSBAND]: Yes, I did.

[DEFENSE COUNSEL]: And was that conversation concerning the re-opening of the Honey Bee?

[PROSECUTOR]: Objection.

THE COURT: Objection is sustained.

[DEFENSE COUNSEL]: What was that conversation about?

[PROSECUTOR]: Objection.

THE COURT: Objection is sustained[.]"

It is clear from the discussion between the defense attorney and the court that trial counsel failed to inform the judge that he was arguing that the testimony was not hearsay because it was being submitted to establish the defendant's husband's state of mind (two months after the fire).

"To preserve an issue for appellate review, a party must make a proper objection at trial that alerts the court and opposing party to the specific grounds for the objection.... Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for review.... 'The specific ground for reversal of an evidentiary ruling on appeal must also be the same as that raised at trial.' "

*United States v. Wynn,* 845 F.2d 1439, 1442 (7th Cir.1988) (citations omitted); *see also United States v. Gonzalez,* 933 F.2d 417, 429 (7th Cir.1991). Since the defendant failed to raise the state-of-mind issue to the trial court, we hold it to be waived on appeal.

## V.  ADMISSION OF THE LEASE AND INSURANCE POLICY

■ In order to establish the defendant's motive in torching the restaurant to ease her financial troubles, the government introduced into evidence the Honey Bee's rental lease, which revealed that the lease could be terminated as the result of a fire, as well as the insurance policy for the restaurant, which included fire coverage. The defendant argues that the trial court committed plain error in admitting the terms of the Honey Bee's lease and insurance policy as motive evidence. Both documents were signed by the defendant's husband alone, and the defendant contends that the government presented no evidence that she had knowledge of the contents of either document. Thus, she asserts that the insurance policy and the lease were not relevant evidence of her motive to torch the establishment. Since the defendant did not object to the admission of the lease nor the insurance policy, she has waived the argument on appeal. *United States v. Harty,* 930 F.2d 1257, 1261 (7th Cir.1991). While we are free to consider arguments that have been waived if we believe there was plain error, *see* Fed.R.Crim.P. 52(b); *United States v. Moya–Gomez,* 860 F.2d 706, 717 n. 11 (7th Cir.1988), we are unpersuaded that any error was committed, much less plain error. The defendant's husband testified at trial that he cannot read. In view of his inability to read and the fact that the defendant was the only person

authorized to write checks on the Honey Bee's account, and furthermore was responsible for paying all the bills, including the timely payments on the lease and insurance policy, it is logical to infer that she was generally aware of their terms. Moreover, it is disingenuous to suggest that the defendant was unaware of the insurance policy coverage, as two prior claims (water damage and glass breakage) were submitted to, and paid by, the insurance company under the policy. Furthermore, had the defendant made a timely objection and raised the alleged lack of her knowledge of the provisions of the lease and insurance documents during trial, the government would have had an opportunity to interrogate her as to how she knew the amount of the payments and when to make them. Had the government been unable to substantiate the defendant's knowledge of the provisions, the trial judge upon proper objection would in all probability have been called upon to assess whether the evidence was relevant. We refuse to reverse the district court for an alleged error not raised during trial.

## VI.  INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

■ The defendant asserts that she received ineffective assistance of counsel as the result of the recently alleged conflict of interest arising from her counsel's representation of her husband on a contingency fee basis in a civil case involving the payment of the $76,000 insurance claim on the fire in question.[9] The defendant now alleges that the conflict of interest adversely affected her trial counsel's representation of her.

The record establishes that the issue of whether the defendant's trial counsel's representation of her husband on a contingency fee basis for the insurance claim would cause a conflict of interest was initially discussed at the defendant's arraignment. Prior to jury selection, the trial court specifically questioned the defendant on this

issue in an attempt to determine whether she was aware of a possible conflict and if there was one, whether she desired the same attorney to continue representing her. The potential conflict raised dealt with the question that a situation might conceivably arise where it would be in the defendant's best interest to plead guilty, but it probably would not be in her attorney's best interest to allow her to do so because of his financial interest in the outcome of her husband's trial as a result of the contingency fee arrangement. But when the trial judge raised this problem with her, the defendant stated emphatically that she had no intention of pleading guilty and wanted her husband's attorney (Cohen) to defend her despite the potential conflict. *See infra.* The record demonstrates that the trial judge went to great lengths to explain this possible conflict of interest and did all in his power to ensure that the defendant clearly understood the possible conflict. The hearing was even adjourned for an hour in order that the attorney might privately discuss the alleged conflict of interest with her. When the hearing resumed, the district court made further inquiries of the defendant concerning the conflict issue:

> "THE COURT: Would you have your client come forward. Mrs. Kladouris, I'm going to go over this with you again. If you were to plead guilty in this case, that would—or at least has the possibility of causing Mr. Cohen to lose some money. Therefore, Mr. Cohen might not be able to give you good and fair advice on the question of whether you ought to plead guilty because your plea of guilty would cost him money.
>
> Do you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And despite that, you still want him to represent you? You want him to be your lawyer?
>
> THE DEFENDANT: Yes, sir.

---

9.  The claim was for policy limits of $60,000 in personal property damages and $16,000 in loss of earnings.

THE COURT: And I take it you have no desire under any circumstances to plead guilty to this [sic] offenses?

THE DEFENDANT: No, I don't, because I'm not.

THE COURT: Is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: No matter what the government may offer you in exchange for a plea of guilty, you would not plead guilty; is that correct?

THE DEFENDANT: No.

. . . .

THE COURT: Well, I am satisfied that— frankly, it's my view that there is in fact no conflict, and to the extent that there is a conflict, I think it has been adequately aired and the defendant has made her position clear."

The record reveals that the defendant knowingly and intelligently waived any conflict of interest her trial counsel may have had due to his interest in the contingency fee. The defendant claims that the trial judge's inquiry was inadequate, since he failed to suggest other possible prejudicial results from the alleged conflict of interest to her.

The appellant speculates that the alleged conflict of interest adversely affected her trial counsel's representation of her because "Cohen's interest in the civil case precluded him from shifting any blame from the defendant to her husband or otherwise distancing her from her husband, even though that might have been in the defendant's best interest." Kladouris further submits that her attorney's failure to object to the admission of evidence concerning the insurance policy and lease as well as his failure to object to the "ostrich" instruction likewise supports an inference of a conflict of interest.

■ We analyze the appellant's ineffective assistance of counsel claim under the test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"Under the *Strickland* test, the defendant must show two things: (1) that his attorney's conduct fell below the minimum professional standards of conduct, and (2)· that this deficient performance was so prejudicial that the outcome for the defendant probably was changed. Of the *Strickland* test the defendant must prove both 'prongs'; conversely, then, upon the defendant's failure to prove either prong, a reviewing court may dispose of the defendant's claim." *Johnston v. Mizell,* 912 F.2d 172, 175 (7th Cir.1990) (citations omitted). The Sixth Amendment right to effective assistance of counsel includes the right to be represented by an attorney who is not operating under a conflict of interest. *See United States v. Balzano,* 916 F.2d 1273, 1292–93 (7th Cir. 1990). "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action [failure to object] 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 (citation omitted). Since the defendant failed to raise an objection to her attorney's alleged conflict of interest at trial, she is required to "demonstrate that an actual conflict of interest adversely affected [her] lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

Our review of the record reflects that the defendant has been unable to demonstrate any specific instance where a possible conflict affected her trial counsel's performance. The defendant testified at trial that she was the last person to leave the Honey Bee at 10:00 p.m.,[10] that she was alone when she exited the restaurant, that she locked the doors behind her, and she did not torch the restaurant. The defendant's trial counsel's strategy to attempt to demonstrate that she was not an arsonist and that the fire was not deliberately set was not only consistent with her testimony but also with her husband's insurance claim. It would have been incredible for the trial attorney to argue that the defendant's husband hired her brother, Sam, or his unidentified companion to set the fire without the

---

**10.** The physical evidence establishes that the fire was burning intensely shortly thereafter, for the minute hand of a clock was melted into place at 10:06 p.m.

defendant's knowledge because the trial testimony revealed that: 1) The defendant Kladouris was with her brother and his friend at the restaurant immediately prior to the blaze (10:00 p.m.); 2) The defendant attempted to cover up her brother's presence at the restaurant by asking the waitresses not to mention having seen him; 3) It was the defendant's car that Sam or his associate retrieved a package therefrom about 10:00 p.m. and carried into the restaurant; and 4) The man who ran out of the restaurant shortly after 10:00 p.m. entered the defendant's car and departed from the premises in it (the defendant testified that she was driving her car when she left the Honey Bee). Thus, it is hard to imagine any logical basis upon which the defense counsel could have argued that the defendant's husband, Jim, planned the arson without her knowledge. We do not agree that sound trial strategy required an objection to the admission of the lease and insurance policy provisions or to the "ostrich" instruction, for we are unaware of any reason why the objections would not have been overruled. See Sections V. & VII. The appellant has failed to demonstrate that her counsel's performance "fell below the minimum professional standards of conduct," and thus we need not consider whether she suffered prejudice.

## VII. OSTRICH INSTRUCTION

■ The defendant asserts that the trial court erred in giving the conscious avoidance or "ostrich" instruction to the jury "because the government argued that the defendant was guilty as an aider and abettor" and "the giving of the 'ostrich' instruction for an aider and abettor is reversible error." The trial court gave the Seventh Circuit Pattern Instruction 6.04 to the jury:

> "You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut her eyes for fear of what she would learn, you may conclude that she acted knowingly as I have used that word."

This court has repeatedly approved the use of this instruction under appropriate circumstances similar to those we have here. *See United States v. DeFazio,* 899 F.2d 626, 635–36 (7th Cir.1990); *United States v. Diaz,* 864 F.2d 544 (7th Cir.1988); *United States v. Holland,* 831 F.2d 717 (7th Cir.1987).

The appellant's argument that it was inappropriate to give the "ostrich" instruction in conjunction with an aider-and-abettor charge either stems from a careless reading of the record or even possibly an attempt to mislead this court. The "ostrich" instruction was given during the final jury instructions to aid the jury in its deliberation concerning the question of whether the defendant knowingly and willfully made false statements to the ATF agent about being alone when she closed the restaurant and about the restaurant bills not being in arrears. The court stated:

> "When the word knowingly is used in these instructions, it means that the defendant realized what she was doing and was aware of the nature of her conduct and did not act through ignorance, mistake or accident.

> "Knowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case."

Tr. at 746. The trial judge included the "ostrich" instruction in the following sentence and, in this context, the instruction relates only to whether the defendant was aware that the statements she gave to the ATF agent were false. Thus, the appellant has failed to support her assertion that the district court erred in giving the "ostrich" instruction.

## VIII. DEFENDANT'S ALLEGED EXPERT WITNESS

■ The expert the defendant offered concerning the cause of the fire neither inspected the scene of the fire nor did he review any photographs much less any of the paper or cardboard samples taken from the scene. The defendant contends that the district court erred in refusing to

allow her proffered expert to testify. The *voir dire* of the defendant's expert witness revealed that he would testify on three issues: the possibility that the fire was caused by spontaneous combustion; the possibility that the presence of petro chemicals does not necessarily mean an arson had occurred; and the fact that certain burn patterns do not necessarily equate with the conclusion of arson. The district court refused to admit his testimony. "[A] reviewing court gives special deference to the evidentiary rulings of the trial court. We shall only overrule such rulings on a showing that the trial court has abused its discretion." *United States v. Shukitis,* 877 F.2d 1322, 1327 (7th Cir.1989) (quoting *United States v. Kaden,* 819 F.2d 813, 818 (7th Cir.1987)). "In admitting or excluding expert evidence under Federal Rule of Evidence 702, the district court has broad discretion and should be affirmed unless the decision is manifestly erroneous." *United States v. Lundy,* 809 F.2d 392, 394 (7th Cir.1987).

The trial court excluded the spontaneous combustion testimony, ruling that the record was barren of a factual basis to support the theory that the fire occurred as a result of spontaneous combustion. The court stated:

> "I believe that the defendant with respect to the spontaneous combustion issue is simply using a witness with significant qualifications in the field to suggest without any other significance, without an adequate basis in the evidence before the Court or the jury any reason why spontaneous combustion should have occurred in this case.
>
> . . . .
>
> "So I exclude the testimony with respect to possibility of spontaneous combustion because I do not believe an adequate factual basis has been laid for this expert to express an opinion. The expert obviously could not express an opinion on the facts of his own examination because he really did not conduct one. The only alternative is a hypothetical question, and there is not an adequate basis for a hypothetical question, so I exclude that testimony."

The appellant's argument that "[t]he trial court's ruling that there was an inadequate factual basis does not justify exclusion of [the expert's] testimony" is absurd. The total absence of a factual basis (not even an examination of the site nor any examination of the physical evidence therefrom) for an expert's testimony always justifies exclusion. Hence, the trial judge properly excluded the testimony concerning the possibility of spontaneous combustion.

The trial court refused to allow the defendant's expert to testify about the significance of the burn pattern of the fire, as the expert's statement that he had never seen an inverted "V" burn pattern indicated that his testimony on that issue would amount to nothing other than speculation. The court found that the expert's testimony on this issue would present "a very substantial danger of confusing the issues and misleading the jury." *See* Rule 403. The defendant failed to object to the trial court's ruling that the witness would be speculating rather than submitting expert testimony and has likewise failed to challenge this finding on appeal. Thus, the appellant has waived her argument that the district court erred in excluding her expert's testimony about the burn pattern.

As to the proffered expert's testimony about the presence of petro chemicals, the district court stated:

> "I think again what we have here is not an expert opinion based on the facts of this case or relevant to the facts of this case; but a general opinion and a general argument but voiced simply by an expert.
>
> "Secondly, I have in this one area some concerns with the witness' qualifications. Because of the nature of the chemistry involved and because of the nature of the testimony offered by the [government's] chemist and because of this witness' specific absence of training in chemistry, I feel that the witness does not have adequate qualifications to express anything beyond the general kind of opinion about hydrocarbons and distillates, which I think for reasons I previously expressed doesn't clear the hurdle of [Rule] 403."

The appellant ignores the district court's ruling that her witness was not qualified to give the proffered testimony and merely asserts that the court should have allowed her alleged expert to testify in order to counter the prosecution's expert who was qualified through experience, knowledge, training and investigation. We agree with the district court's ruling that the witness' lack of training in chemistry prevented him from testifying as an expert on the significance of the presence of the petro chemicals at the scene of the fire. "District courts must ensure that expert opinion testimony is in fact expert opinion, not merely opinion given by an expert," *Lundy*, 809 F.2d at 396, and that such testimony would aid the jury. The district court's decision to exclude the alleged expert's testimony was not an abuse of discretion.

## IX. CONCLUSION

The decision of the district court is AFFIRMED.