No. 2--99--0919 

IN THE 

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court 

OF ILLINOIS, ) of Lake County.

)

Plaintiff-Appellee, ) 

) 

v. ) No. 97--CF--1313 

) 

GEORGE JOHNSON, ) Honorable 

) John T. Phillips,

Defendant-Appellant. ) Judge, Presiding.

 

JUSTICE CALLUM delivered the opinion of the court:

The State charged defendant, George Johnson, with two counts of predatory criminal sexual assault of a child (720 ILCS 5/12--14.1(a)(1) (West 1998)) and one count of aggravated criminal sexual abuse (720 ILCS 5/12--16 (c)(1)(i) (West 1998)).  The charges were based on defendant’s alleged sexual abuse of four-year-old C.P.  The State later filed a petition to have defendant declared a sexually dangerous person pursuant to the Sexually Dangerous Persons Act (the Act) (725 ILCS 205/0.01 
et
 
seq
. (West 1998)).  The State ultimately elected to proceed on the sexually dangerous person petition.  Following a jury trial, defendant was found to be sexually dangerous, and the court committed defendant to the Department of Corrections and appointed the Director of the Department as his guardian.  Defendant appeals, arguing that (1) he was denied the effective assistance of counsel; (2) the trial court erred in applying the rape shield statute (725 ILCS 5/115--7 (West 1996)) in a civil case; and (3) the jury was not properly instructed.
(footnote: 1)   We affirm.

BACKGROUND

The evidence the State presented to prove defendant’s sexual dangerousness was as follows.  C.P. testified that when she was four years old defendant would babysit for her.  Defendant was her mother’s friend.  According to C.P., defendant touched her "front part" under her waist, which C.P. described as the area where she goes to the bathroom.  This happened more than once, and each time defendant would tell her not to tell anyone.  C.P., however, told her mother, her grandmother, and her great-grandmother about the incidents.

C.P.’s grandmother, Pamela Hall, and great-grandmother, Linda Hall, testified about C.P.’s statements to them.  C.P. told Pamela that defendant put his finger in her butt and licked her "privates."  When Pamela confronted defendant about the incident, he told her that he had fallen asleep and, when he woke up, he found C.P. sitting on his face. Pamela testified that C.P. told her that defendant had played with her privates.  Specifically, she told her that defendant had stuck his fingers inside her.  After this incident, C.P. complained that it hurt to go to the bathroom, she would not wear underpants, and she would not let Pamela help her with her bath.  C.P. would scream when she tried to move her bowels.  

Dr. Karen Cervenka testified that she tried to conduct a physical examination of C.P., but that C.P. became very upset and agitated and would not let her do it.  C.P. told her that someone had touched her private area.

A.R. testified that in 1979 she was 15 years old and staying in the same hospital as defendant.  The defendant befriended her.  They would share activities, and defendant would bring her candy.  One day, in the TV room, defendant groped her breasts.  Another time, in A.R.’s room, defendant had her take off all of her clothes.  He then used his mouth and hands to touch her breasts and vagina.  On another occasion, he had her pushed up against her bed, but hospital staff came in before anything happened.  On at least four occasions, defendant stood outside and handed A.R. candy through her window.  He would then have her undress and he would look at her.  In addition to the testimony about the C.P. and A.R. incidents, the State introduced certified copies of defendant’s prior convictions of aggravated indecent liberties with a child.  

Two psychiatrists and a psychologist evaluated defendant.  Dr. Peter Fink, a psychiatrist who works at the Isaac Ray Center, concluded that defendant suffered from the mental disease pedophilia.  Specifically, defendant exhibited a chronic interest in young females.  Fink reached his conclusion based upon an interview with defendant and the results of tests administered to defendant.  One of the tests was a penile pleythsmography.  This test involves sitting the subject in an easy chair in a quiet, cinder-block room.  A circular string gauge is then fitted over the base of the subject’s penis.  The gauge expands when the penis becomes engorged with blood, and the growth of the penis is measured by a recording device that is attached to the gauge.  Once a subject is hooked up to the gauge, he is shown various sexual stimuli involving children and adults of both sexes.  Defendant’s strongest reaction was to an audiotape of a pedophilic interaction with a young girl.  Defendant also had reactions to adult women. The only reactions to homosexual stimuli were to children.  Dr. Fink believed that defendant was a high risk to reoffend because defendant had arousals to illegal stimuli with children, defendant’s arousal pattern was persistent over the past 20 years, and defendant had a pattern of denial and rationalization as to the cause of the arousal.  Further, defendant had not taken steps to learn how to manage his interests and to lower his arousal pattern.  Dr. Fink believed that defendant’s treatment potential was low because defendant believed that his only problem was with the legal system.  Defendant exhibited signs of paranoia and suspicion and believed that Dr. Fink was part of a vast criminal conspiracy against him.   

Dr. Norman Stanley Miller, a professor of psychiatry at Michigan State University, conducted an evaluation of and a clinical interview with defendant.  Additionally, Dr. Miller reviewed defendant’s police and Department of Corrections records, and the results of psychological tests administered to defendant.  Defendant was evasive, defensive, and argumentative during the interview and blamed others for his past and current predicament. Dr. Miller concluded that defendant suffered from pedophilia, voyeurism, exhibitionism, and an anti-social personality disorder.  Dr. Miller believed that defendant was a substantial and significant risk to reoffend.  This conclusion was based on defendant's having repeatedly engaged in pedophilic behavior while refusing to acknowledge that he had a problem.  Dr. Miller believed that defendant’s ability to comprehend his problem was minimal to nonexistent.  Defendant is not a good candidate for sex offender treatment because he neither thinks he has a problem nor wants treatment. 

Dr. Tony Alan Fletcher is a psychologist at the Isaac Ray Center who performed a series of psychological tests on defendant.  Fletcher concluded that defendant suffered from pedophilia and a delusional disorder.  Defendant’s denial of his past pedophilic episodes led Dr. Fletcher to conclude that defendant was a high risk to reoffend. Dr. Fletcher believed that defendant was a very dangerous person and had the textbook profile of someone who has trouble controlling his impulses.

ANALYSIS

Ineffective Assistance of Counsel

Defendant first argues that he received the ineffective assistance of counsel.  This argument consists of two components: (1) defendant’s attorney was operating under a
 conflict of interest when he was under felony indictment or on probation during the entire time he was representing defendant, and (2) he was actually ineffective under 
Strickland v. Washington
, 466 U.S. 668,  80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

Although proceedings under the Act are civil, the potential loss of liberty entitles a defendant named in a petition under the Act to the essential protections available in a criminal trial.  
People v. Bailey
, 265 Ill. App. 3d 758, 761 (1994).  Accordingly, a defendant in a sexually dangerous person proceeding is entitled to the effective assistance of counsel.  
Bailey
, 265 Ill. App. 3d at 763.  Where a constitutional right to counsel exists, there is a correlative right to representation that is free from conflicts of interest.  
Wood v. Georgia
, 450 U.S. 261, 271, 67 L. Ed. 2d 220, 230, 101 S. Ct. 1097, 1103 (1981).  A 
per
 
se
 conflict of interest, 
i.e.
, one that warrants reversal even without a showing of actual prejudice, will be found when there is a showing that a defense counsel’s past or present commitment to others raises the possibility of an unwillingness or inability to represent a defendant effectively. 
People v. Becerril
, 307 Ill. App. 3d 518, 524 (1999).

Defendant was represented at trial by attorney Joseph Harris.  In February 1998, Harris was indicted by a Lake County grand jury on three counts of forgery and two counts of perjury.  In addition to prosecuting Harris, the Lake County State’s Attorney’s office filed a complaint against him with the Attorney Registration and Disciplinary Commission.  Harris pleaded guilty to one count of the indictment and was placed on probation for two years.  Harris filed his appearance on defendant’s behalf in April 1998 and represented him on and off in pretrial matters and then represented him throughout the trial that commenced in June 1999.  Thus, throughout Harris’s representation of defendant, he was either under indictment or on probation in Lake County.  The Lake County State’s Attorney’s office, the entity that was prosecuting defendant, also prosecuted Harris.  That office also would have prosecuted any probation violation by Harris.

Defendant first argues that Harris was operating under a 
per
 
se
 conflict of interest because he was being prosecuted by or was under probation with the same entity that was prosecuting defendant.  According to defendant, this created a situation in which Harris was likely to temper his efforts on defendant’s behalf so as not to anger the Lake County State’s Attorney’s office.  

In 
People v. Spreitzer
, 123 Ill. 2d 1, 14-15 (1988), the supreme court reviewed the cases in which it had found 
per
 
se
 conflicts of interests.  Such conflicts were found where the defense attorney simultaneously served as a part-time attorney for the municipality where the defendant was being prosecuted (
People v. Washington
, 101 Ill. 2d 104 (1984)); simultaneously served as a special assistant Attorney General handling unemployment compensation cases for the State (
People v. Fife
, 76 Ill. 2d 418 (1979)); simultaneously served as the attorney for the administrator of the victim’s estate (
People v. Coslet
, 67 Ill. 2d 127 (1977)); had previously served as the assistant State’s Attorney in the State’s prosecution of the defendant and had made three court appearances on the State’s behalf (
People v. Kester
, 66 Ill. 2d 162 (1977)); and simultaneously represented the defendant, the corporation whose store had been burglarized and the store’s owner (
People v. Stoval
, 40 Ill. 2d 109 (1968)).  The court explained that the 
per
 
se
 rule is applied in cases involving a direct conflict between the interests of two opposing clients or between a present client and a past personal commitment.  
Spreitzer
, 123 Ill. 2d at 21. 

The case before us does not fall into the class of cases in which the supreme court has identified 
per
 
se
 conflicts of interests.  Those cases all involved situations in which an attorney had acted or was acting in a representative capacity for clients with opposing interests.  Here, defendant argues that the conflict arose because defendant and his attorney were both being prosecuted by the same entity.  Defendant contends that his case is similar to 
Kester
, in which the supreme court found that a 
per
 
se
 conflict of interest was created by the defense attorney’s prior association with the prosecution.  
Kester
 is entirely distinguishable.  In that case, the defense attorney previously had been employed by the Peoria County State’s Attorney and had actually participated in the prosecution of the defendant.  The court held that prejudice would be presumed in a situation in which "a prosecutor who personally has been involved in the prosecution of a defendant in a particular criminal proceeding later assumes the duties of court-appointed defense counsel for that defendant in the same proceeding."  
Kester
, 66 Ill. 2d at 167.  The situation here is unlike any of those in which our supreme court has found a 
per
 
se
 conflict of interest, and therefore we must reject defendant’s argument.  

We note that the United States Court of Appeals for the Seventh Circuit has also rejected the notion that a conflict of interest is automatically created when the defendant’s attorney is himself under criminal investigation.  The Seventh Circuit has held that an actual fear of retaliation must be shown.  See, 
e.g.
, 
 
Thompkins v. Cohen
, 965 F.2d 330, 332 (7th
 Cir. 1992); 
United States v. Balzano
, 916 F.2d 1273, 1293 (7th
 Cir. 1990).  Here, defendant does not argue that Harris suffered an actual fear of retaliation, nor does the record support such a claim.   

We next consider whether there was a conflict of interest based on the facts of this particular case. When a defendant alleges a conflict of interest that falls outside the 
per
 
se
 rule, two distinct lines of analysis have been used.  If the conflict is brought to the trial judge’s attention at an early stage, the judge has a duty either to appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict was too remote to warrant separate counsel.  
Holloway v. Arkansas
, 435 U.S. 475, 484, 55 L. Ed. 2d 426, 434, 98 S. Ct. 1173, 1178 (1978); 
Spreitzer
, 123 Ill. 2d at 18.  As part of the inquiry, the trial judge may also inquire if the defendant wishes to be represented by the attorney regardless of the conflict. 
Wood
, 450 U.S. at 271, 67 L. Ed. 2d at 230, 101 S. Ct. at 1103; 
Thompkins
, 965 F.2d at 332. If the trial judge is not apprised of the potential conflict, the defendant must demonstrate that the conflict actually affected the attorney’s performance.  
Spreitzer
, 123 Ill. 2d at 18.  A defendant may knowingly and intelligently waive an alleged conflict of interest. 
Fife
, 76 Ill. 2d at 424-25; 
United States v. Kladouris
, 964 F.2d 658, 667 (7th Cir. 1992); 
Rosenwald v. United States
, 898 F.2d 585, 588 (7th Cir. 1990).

We find that defendant knowingly and intelligently waived any conflict of interest by Harris.  As defendant’s trial was beginning, the State informed the trial judge that Harris was on felony probation in Lake County and that, if Harris violated his probation, the Lake County State’s Attorney’s office would be prosecuting him.  The State also informed the trial court that one of the prosecutors had been subpoenaed in a proceeding against Harris by the Attorney Registration and Disciplinary Commission (ARDC).  The State argued that Harris should not be allowed to represent defendant.  The following colloquy then took place between the trial judge and defendant:

"THE COURT: Okay. So let me ask you this, Mr. Johnson: Mr. Strickland just indicated to me that Mr. Harris is on probation.

You know that, don’t you?

MR. JOHNSON: Yes, your honor.

THE COURT: He’s indicated to me that in the event that for any reason that Mr. Harris would be alleged to have violated his probation, that the State’s Attorney’s Office would be the one that would have to bring a petition, or be representing the State against your lawyer.

Do you understand that?

MR. JOHNSON: Yes, your honor.

***

THE COURT: You understand, it’s going to look pretty strange -- if after you now telling me that you want him to represent you -- knowing all of these things that are going on, it’s going to look pretty strange if you don’t like the result of this case, now, to go back and complain that you didn’t want him to represent you?

Do you understand that?

MR. JOHNSON: Yes, I understand that, your Honor.

THE COURT: And I’m going to ask you again, Mr. Johnson, do you want to have Mr. Harris represent you?

MR. JOHNSON: Yes, your Honor." 

Defendant disagrees that he waived the conflict, arguing that the court "forced" him to trial with Harris as his attorney and gave him only two options: proceed with Harris or proceed 
pro
 
se
.  Defendant contends that this was a Hobson’s choice, precluding any finding of waiver on his part.  Defendant misrepresents the record.  The trial judge did not force him to choose between representing himself or having Harris as his attorney.  At this stage in the proceedings, defendant had already elected to proceed 
pro
 
se
 and had agreed that he would not be able to have any more continuances to hire another attorney.  During the pretrial proceedings, defendant had been represented by at least six different attorneys and fired every one of them when they would not follow his chosen strategy.  He also filed complaints with the ARDC against all of his attorneys.  Eventually, defendant elected to proceed 
pro
 
se
.  The trial judge questioned defendant extensively to determine if he was capable of reaching this decision knowingly and intelligently.  He also thoroughly admonished defendant of the consequences of his decision.  The admonitions about the consequences of 
pro
 
se
 representation cover approximately 30 pages of the report of proceedings.  Defendant assured the trial judge that he understood that he would have to follow the same rules of trial procedure required of attorneys, despite the fact that he lacked the proper training and experience; that his adversary would be a trained attorney; that defendant’s inexperience might lead him to make numerous and disastrous mistakes; and that no one was going to explain proper court procedures to him.  Further, the court explained to defendant that, if he tried to change his mind and hire yet another attorney, there would be no more continuances and the trial would proceed.  Defendant told the court, "I have no intention of hiring another attorney."

After representing himself during one hearing, defendant told the court that he did not want to proceed 
pro
 
se
 and that he wanted to hire another attorney.  Defendant complained that he had not been given a chance to hire an attorney of his choosing, that he could not proceed 
pro
 
se
 because he knew "nothing about court procedures," and that he would like to have Harris represent him.  Harris was still technically on the case at this point and was moving for a formal withdrawal because defendant had fired him.  The court reminded defendant of his previous statements, but told him that he could have Harris represent him. Harris told the judge that he needed a few days to prepare, and the court granted him a two-day continuance.

It is clear from this series of events that the court did not  "force" defendant either to proceed 
pro
 
se
 or to use an attorney who had a conflict of interest.  Rather, the record shows a litany of game playing and shenanigans by defendant, who continually hired and fired attorneys and reported them to the ARDC when they disagreed with his defense strategy. (Continuing in this vein, defendant has filed a motion with this court accusing his appellate attorney of committing "numerous felonies" in this appeal.) Defendant finally elected to proceed 
pro
 
se
, was thoroughly admonished of the consequences and magnitude of such a decision, and agreed that there would be no more continuances if he tried to hire another attorney.  After representing himself at one hearing, defendant asserted that he did not know enough about trial procedure to proceed 
pro
 
se
.  The trial judge allowed him to proceed with Harris, who was still technically of record.  When defendant was informed of Harris's potential conflict of interest, defendant knowingly and intelligently waived the conflict and elected to proceed with Harris as his attorney.  Defendant’s situation was entirely of his own making.  Defendant’s claim that he was "forced" to choose this path and did not waive the potential conflict is both disingenuous and utterly without merit.

The final prong of defendant’s ineffective assistance argument is that Harris was actually ineffective under the 
Strickland
 standard. To establish a claim of ineffective assistance of counsel, a defendant must show that (1) counsel’s performance fell below an objective standard of reasonableness, and (2) there exists a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.  
Strickland v. Washington
, 466 U.S. 668, 687-94, 80 L. Ed. 2d 674, 693-98, 104 S. Ct. 2052, 2064-68 (1984).

Defendant argues that Harris was ineffective in that his pretrial preparation was inadequate, his cross-examination of State witnesses was more damaging to defendant than helpful, and Harris lacked expertise in this area.  Our response to this argument is twofold.  First, it is well settled that a defendant may not be heard to complain of errors that he injected into his own trial.  
People v. Scott
, 148 Ill. 2d 479, 531 (1992).  To the extent that Harris exhibited a lack of preparedness, this situation was entirely of defendant’s own making.  As detailed above, defendant hired and fired a litany of attorneys and then brought Harris back into the case after defendant had already elected to proceed 
pro
 
se
.  Defendant was fully aware that Harris had not been actively working on the case for months and told the trial judge that he agreed there would be no more continuances if he tried to hire another attorney after deciding to proceed 
pro
 
se
.  When defendant changed his mind about proceeding 
pro
 
se
, he was aware that Harris would be given only an additional two days to prepare and agreed to this situation.

More importantly, however, defendant has failed to meet the prejudice prong of the 
Strickland
 standard.  Claims of ineffectiveness often can be disposed of on the ground that the defendant suffered no prejudice from the claimed errors, without deciding whether the errors were serious enough to constitute less than reasonably effective assistance.  
People v. Caballero
, 126 Ill. 2d 248, 260 (1989).  Defendant devotes virtually his entire argument to explaining why certain avenues taken by Harris were poor choices, but he does not explain how he was prejudiced except to suggest that Harris was defendant’s own worst enemy in that he elicited damaging information on cross-examination.

Defendant has failed to demonstrate that, without the alleged errors by Harris, a reasonable probability exists that he would not have been found sexually dangerous.  The jury heard testimony from two psychiatrists and a psychologist that defendant is a pedophile  and is a substantial risk to reoffend.  The experts' testimony further showed that defendant refuses to acknowledge or accept responsibility for his problem.  The jury also heard testimony of defendant’s sexual molestation of a four-year-old girl who had been entrusted to his care, his prior molestation of a teenager in a hospital, and his prior convictions for aggravated indecent liberties with a child.  Given the overwhelming evidence of defendant’s sexual dangerousness, defendant has failed to demonstrate a reasonable probability that he would not have been found sexually dangerous if Harris had not made the alleged errors.

Defendant also suggests that counsel was ineffective under the standard announced in 
United States v. Cronic
, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984).  In cases where defense counsel entirely fails to subject the prosecution’s case to meaningful adversarial testing, prejudice will be presumed.  
Cronic
, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047; 
People v. Hattery
, 109 Ill. 2d 449, 461 (1985).  This standard is usually applied in cases in which a defense attorney concedes his client’s guilt. See 
Hattery
, 109 Ill. 2d at 462-64 (and cases cited therein).  Although Harris’s representation may not have been as effective as it could have been if defendant had not fired him and then brought him back at the last minute, Harris did not utterly fail to subject the State’s case to meaningful adversarial testing.  He did not concede his client’s sexual dangerousness and, indeed, strenuously and vigorously argued to the jury that the State had not established defendant’s sexual dangerousness beyond a reasonable doubt.  Defendant’s argument for application of the 
Cronic
 standard is meritless.

[Nonpublishable material under Supreme Court Rule 23 omitted here.]

CONCLUSION

In sum, we hold that (1) defendant waived any conflict of interest by Harris; (2) defendant did not receive the ineffective assistance of counsel; (3) defendant waived his argument that the rape shield statute was inapplicable; and (4) the trial judge did not abuse its discretion in determining the proper jury instructions.  Accordingly, we affirm the judgment of the circuit court of Lake County.

Affirmed.

RAPP and GROMETER, JJ., concur.

FOOTNOTES
1: Arguments (2) and (3) are discussed in the nonpublished portion of this opinion.