*In re* DETENTION OF JACKIE HUGHES (The People of the State of Illinois, Petitioner-Appellee, v. Jackie Hughes, Respondent-Appellant).

Second District   No. 2—00—0999

Opinion filed March 4, 2004.

G. Joseph Weller and Darren E. Miller, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Martin P. Moltz, of State's Attorneys Appellate Prosecutor's Office, and Barbara A. Preiner, of Deitsch & Preiner, of Wheaton), for the People.

JUSTICE KAPALA delivered the opinion of the court:

A Lake County jury found respondent, Jackie Hughes, to be a sexually dangerous person under the Sexually Dangerous Persons Act (SDPA) (725 ILCS 205/0.01 through 12 (West 1998)) and the circuit court ordered commitment. This court affirmed the jury verdict and order of commitment. *In re Detention of Hughes*, 338 Ill. App. 3d 224 (2003). Our supreme court denied respondent's petition for leave to appeal but, under its supervisory authority, directed this court to vacate our opinion and reconsider our judgment in light of *People v. Masterson*, 207 Ill. 2d 305 (2003). We now vacate our prior opinion pursuant to that order and file this opinion in its stead. Upon reconsideration we reverse the judgment of the circuit court and remand for further proceedings.

In our initial opinion we rejected all of respondent's appellate contentions, including (1) that he was denied his statutory and constitutional rights to a speedy trial, (2) that it was error to allow a State expert to rely on and testify about a penile plethysmograph (plethysmograph) examination given to respondent, (3) that the State exercised a peremptory challenge to exclude the only black member of the venire, in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), and (4) that the SDPA violates due

process because it contains no provision requiring the State to prove that a respondent has a "serious difficulty in controlling behavior," as required by the United States Supreme Court in *Kansas v. Hendricks,* 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997), and *Kansas v. Crane,* 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002). In light of our supreme court's decision in *Masterson,* we continue to hold that the SDPA does not run afoul of substantive due process. However, we deem it necessary to remand the cause to the trial court for a new hearing on the State's petition so that the jury can be properly instructed on the elements that must be proved to sustain a finding that a person is subject to civil commitment under the SDPA. These standards were announced in *Masterson* and ensure compliance with the United States Supreme Court's decision in *Crane. Masterson,* 207 Ill. 2d at 330. We need not address respondent's third contention, as the remedy for a *Batson* violation is a new hearing (see *People v. McDonald,* 125 Ill. 2d 182, 200-01 (1988)) and we have determined that this cause must be remanded for a new hearing based on *Masterson.* We will address respondent's contention regarding the plethysmograph because it is likely to recur upon remand. We will also address respondent's speedy trial contention because, if meritorious, an outright reversal would be required.

## BACKGROUND

On August 11, 1999, respondent was indicted on various charges pertaining to sex offenses involving minors. Respondent was taken into custody on these charges on July 22, 1999, and was denied bond on July 27, 1999. The trial court set the trial date for September 13, 1999.

On September 10, 1999, the trial court granted respondent's oral motion for a continuance and set the trial for October 13, 1999. On October 13, 1999, respondent moved to continue the trial because he needed to review DNA test results and possibly consult with an expert. The trial was continued until November 29, 1999.

On November 4, 1999, respondent filed a motion to suppress certain statements he made to the police, which was heard on November 10 and 17, 1999. Also, on November 17, a hearing was conducted pursuant to section 115—10 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115—10 (West 1998)) concerning the admission of certain hearsay statements. The section 115—10 hearing was continued to November 24, 1999.

When the continued hearing date arrived, the State moved to continue the trial, asserting it needed more time to prepare the minor victims for trial because it had recently learned that one had a learn-

ing disability and the other was having difficulty speaking due to fear. Over respondent's objection, the trial court granted the State's motion and set the trial for January 10, 2000.

The State filed its petition to declare respondent a sexually dangerous person on December 30, 1999. On that same date, respondent objected to the filing of the "sexually dangerous person" petition, objected to any further delay, and filed a demand for a speedy trial. The trial court set the matter for status on January 24, 2000, and for trial on February 14, 2000. Also, on December 30, 1999, the trial court suppressed certain statements respondent made to the police, because the State failed to prove that they were voluntary and that respondent waived his right to counsel.

On January 5, 2000, the trial court denied respondent's motion to preclude disclosure to court-appointed psychiatrists of the previously suppressed statements he made to the police. On January 6, the trial court ordered respondent transported for a plethysmograph test and ordered respondent to cooperate with all psychiatrists and their testing. The trial court also ordered respondent to be transported on January 13, 2000, to Dr. Oris Wasyliw for psychological evaluation.

On February 14, 2000, the trial court granted the State's motion to reschedule the hearing to March 31, 2000. Respondent's counsel answered ready for the February 14 trial.

On March 21, an attorney from the public defender's office moved for a continuance because respondent's former counsel had left the public defender's office. The trial court continued the trial to June 5, 2000. On June 2, respondent requested another continuance, and the trial was set for August 14, 2000. The jury trial on the State's petition commenced on August 14, 2000.

In addition to the other evidence at trial, the State offered the expert testimony of several witnesses. Oris Wasyliw, the director of adult clinical psychology at the Isaac Ray Center in Chicago, testified that he evaluated respondent. As part of that evaluation, he conducted a clinical interview of respondent as well as several objective tests. Wasyliw also reviewed prior evaluations, prior treatment records, police reports, and court documents.

According to Wasyliw, in the interview respondent said that he was attracted to young girls because of how they conducted themselves, including how they talked about what they saw their mothers do with their mothers' boyfriends. To Wasyliw, this meant that respondent was not talking about an individual but about an idea he had of how children conducted themselves as a group.

As for objective tests, Wasyliw administered a Minnesota Multiphasic Personality Inventory (MMPI). The MMPI determines

whether a subject is being honest and whether he is exaggerating or minimizing a problem. It further assesses the presence, type, and severity of any emotional difficulties. The MMPI showed that respondent was minimizing or denying his problems. The test also indicated a very high score on the scale of antisocial personality and hostility.

Wasyliw also conducted a Millon Clinical Multiaxial Inventory (MCMI). Though similar to the MMPI, the MCMI is designed to conform more closely to the manual of mental health disorders that psychologists and psychiatrists use for classifying disorders.

The MCMI results were consistent with the MMPI in showing that respondent is trying to minimize or deny problems or areas of dif-. ficulty in his life. According to Wasyliw, that is a complicated way of saying that respondent is "hiding something."

Wasyliw also conducted a Rorschach inkblot test. The test showed that respondent is under a substantial amount of tension and somewhat emotionally fragile, suggesting that under increased stress he could have emotional problems. Second, it showed that respondent has very poor judgment in understanding other people. Third, the results indicated that respondent has a substantially narcissistic personality, which means he has an inflated view of himself and blames others when something goes wrong. According to Wasyliw, this indicates respondent does not accept responsibility for his actions.

Based upon his entire evaluation, Wasyliw opined that respondent suffered from a paraphilia disorder, which is a sexual arousal occasioned by something that society considers inappropriate and which can cause harm to either the individual or another person. Specifically, respondent suffers from pedophilia in that he is sexually attracted to female children and children outside his own family. Wasyliw further opined that respondent continues to be at risk for inappropriate sexual behavior because of his lack of insight into his problem, his minimizing or hiding of his problem, and his lack of motivation to change. Further, Wasyliw found this significant in light of respondent having been involved in treatment for over three years.

The State also offered the testimony of Rodgers Wilson, a forensic psychiatrist, also employed at the Isaac Ray Center. Wilson reviewed records, police reports, and test results for respondent. He also conducted a clinical interview of respondent.

Based on his review of medical records, his clinical interview, police reports, an Able screening test, which assesses sexual interest, and plethysmograph test results, Wilson concluded that respondent is a sexually dangerous person. Specifically, he opined that respondent is a pedophile and that he presents an ongoing risk to society. Wilson

defined "pedophile" as a person "who has demonstrated dangerous sexual behaviors that pose a risk to society." The three factors that are considered in that diagnosis are the level of psychological disease, the person's insight into the disease and how it impacts others, and the person's ability to have remorse and refrain from certain behavior. According to Wilson, past behavior is considered an indicator of future conduct.

Wilson, who did not administer the test himself, described a plethysmograph as a test used to measure sexual interest. A gauge is placed around the subject's penis and he is exposed to a variety of visual and audio stimuli. The visual stimuli consist of pictures of males, females, adults, and children. The examiner looks for changes in circumference of the penis when the subject is shown or played the stimuli. In defendant's case, the test showed he had a sexual interest in prepubescent females, as well as adolescent males and females and adult males and females. The threshold for sexual arousal is a 10% increase in the circumference of the penis. Respondent exhibited a 35% increase as to prepubescent females and a 20% increase regarding adolescent females. Wilson defined prepubescent as before the age of 12. Respondent's reaction to prepubescent females was the strongest he displayed on the test.

Respondent was also administered a sexual interest questionnaire. According to Wilson, some of respondent's answers indicate he justifies his deviance by blaming the victims. Part of the questionnaire focuses on child molestation. Respondent answered that he had manipulated a child to get sexual pleasure and that he had molested more than one child.

In regard to his 1996 conviction, respondent admitted to abusing the child but explained that he became sexually aroused after the child touched him. Wilson explained that this was significant to his diagnosis of respondent as a pedophile because of respondent's inclination to distort and rationalize his behavior.

Wilson also reviewed police reports that contained statements respondent made to the police about prepubescent girls. Wilson found some of those statements to be consistent with his assessment of respondent's rationalization. For example, Wilson stated that it is clinically significant that respondent told the police it is easier for him to achieve a full erection when he is sexually engaged with a child as opposed to an adult woman. This was particularly relevant to Wilson's assessment of respondent as a sexually dangerous person because it shows a "poor prognosis" for treating respondent. Wilson also reviewed the reports from respondent's counselor, Evaristo Ruiz, in which respondent admitted molesting a child in 1985 and, again, in 1991.

Wilson explained that there are various levels of dangerousness or severity of pedophilia. If a person is justifying or rationalizing his behavior, that shows a "very poor treatment prognosis." Also, narcissism, from which respondent suffers, indicates poor treatment prognosis because the person has no sense of any consequences. Finally, respondent's lack of empathy makes it difficult for him to succeed in counseling.

Wilson defined pedophilia based on the Diagnostic and Statistical Manual, or DSM-IV. The manual, published by the American Psychiatric Association, is based on clinical research and is nationally recognized as a text of mental disorders. Respondent meets the criteria for pedophilia under the DSM-IV. Wilson also considered respondent's prognosis to be "extremely poor" and stated that "he is at high risk to reoffend." He described respondent as displaying "severe" symptoms of pedophilia. Wilson pointed out examples of respondent's symptoms, including respondent engaging in vaginal penetration of children, experiencing arousal related to coercion, and his responses during the plethysmograph testing.

Norman Miller, a licensed psychiatrist, also testified for the State. Miller conducted a clinical interview of respondent for the purpose of determining if he was sexually dangerous and had a propensity to commit sexual offenses against children. Miller also had a clinical psychologist perform objective tests on respondent, including an MMPI. Based on the interview, the MMPI, and a review of respondent's records, Miller opined that respondent is a sexually dangerous person who has suffered from pedophilia since at least 1983 or 1984. Miller also opined that, because respondent continues to spend time around children, his "risk for reoffending is very high." According to Miller, respondent's prognosis is poor based on his long history of pedophilia, his poor response to treatment, and his current level of denial. Also, due to his antisocial behavior, respondent has a personality that makes it difficult for him to accept responsibility and change. Miller admitted on cross-examination that not every pedophile or person with an antisocial personality would be sexually dangerous.

Also testifying for the State was Evaristo Ruiz, who was employed by Adelante, P.C., a practice that specializes in evaluating and treating sex offenders. In February or March of 1996, Ruiz performed a sex offender evaluation on respondent to determine whether he was qualified for an outpatient sex offender treatment program.

During the course of Ruiz's evaluation, respondent admitted to molesting two young girls. He also told Ruiz he was "out of control, that he couldn't control these fantasies." On cross-examination, Ruiz admitted that, as part of his evaluation of respondent's treatment,

Ruiz had reported that as of July 1999 respondent was making "good progress" and had developed a "good level of victim empathy."

During closing argument, the State discussed the plethysmograph as follows:

"[Pedophilia] is also told by tests that check your physiological responses to certain stimuli the way doctors talked and that is the plethysmograph thing you heard about. Spend 30 seconds thinking about a plethysmograph. This is a test that determines or measures sexual arousal, basically involuntary reaction. Picture it. You are going in some sterile, the most unerotic setting you can ever imagine with several people all around you.

* * *

There are people in the room in his case at least Dr. Wasyliw with all his machinery in what can never be described in a sensual kind of way and they show dirty pictures of little kids and they do it with this wire wrapped around the man's penis. A man who in Mr. Grant's word has a cloud of a sexually dangerous person hanging over his head. A man who has to be thinking in his head I am going to try to be as unaroused as possible.

I don't know if a person would be thinking about Mickey Mantle's baseball scores or whatever but anything but arousal. And in that context they show him pictures of prepubescent girls and while trying to put himself into a mental cold shower he still has a 35 percent increase."

During rebuttal, the State further argued:

"He is sitting in a room as sterile as this with a band around his penis and he is having reactions to dirty pictures of little girls. But what does the respondent say? No. No. That never happened.

So the doctor lied. Why? I have no idea, but Dr. Wasyliw[,] court-appointed man who is an expert in the field who has years of education[,] made this up. The reality of the situation is that is what happened. The respondent can deny it all he wants, just like he denies anything else. You want to talk about distortion, that is distortion because he knows what that is going to produce. We got a problem here."

The court instructed the jury that a person is sexually dangerous if that person: "suffers from a mental disorder for not less than one year immediately prior to the filing of a petition to declare him sexually dangerous and he demonstrates propensities toward acts of sexual assault or acts of sexual molestation of children and he continues to have criminal propensities to commit sex offenses."

The jury found respondent to be a sexually dangerous person, and judgment was entered on the verdict. Respondent filed a posttrial motion in which he did not raise any error as to the reference to the

plethysmograph, the constitutionality of the SDPA, or the denial of a speedy trial. The posttrial motion was denied, and respondent filed this timely appeal.

## ANALYSIS

We first address the issue of whether respondent was denied a speedy trial. In this regard, he contends that the Illinois speedy trial statute, section 103—5 of the Code (725 ILCS 5/103—5 (West 1998)) (Speedy Trial Act), applies to a proceeding under the SDPA and that, because he was in custody, the State had to begin the trial within 120 days from the time he was taken into custody. Alternatively, he argues that he was denied his constitutional speedy trial right.

We note initially that respondent concedes that he waived the speedy trial issues by not moving to dismiss or raising the issues in his posttrial motion. As for the issue of whether he was denied a statutory right to a speedy trial, respondent seeks to sidestep waiver by contending that his trial counsel was ineffective for failing to raise the issue in the trial court.

■ To prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant such that he was deprived of a fair trial. *People v. Nunez*, 325 Ill. App. 3d 35, 42 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Nunez*, 325 Ill. App. 3d at 42. With regard to respondent's claims under the Speedy Trial Act, we conclude that respondent's counsel's performance did not result in prejudice to respondent, because the Speedy Trial Act is not applicable to a proceeding under the SDPA.

■ By its own language, the Speedy Trial Act is limited to criminal prosecutions. It provides, in relevant part, that "[e]very person in custody in this State for an alleged *offense* shall be tried by the court." (Emphasis added) 725 ILCS 5/103—5(a) (West 1998). This language speaks of a trial for a charged offense, as opposed to any other type of proceeding, such as one under the SDPA. The Code defines an offense as "a violation of any penal statute of this State." 725 ILCS 5/102—15 (West 1998). While a respondent under the SDPA must be accorded the essential protections available at a criminal trial, the proceedings are civil in nature and the Civil Practice Law (735 ILCS 5/2—101 *et seq.* (West 1998)) applies. 725 ILCS 205/3.01 (West 1998); *People v. Trainor*, 196 Ill. 2d 318, 328 (2001). As such, we consider the Speedy Trial Act, by its own terms, not to apply to the SDPA. *Cf. People v.*

*Glenn,* 142 Ill. App. 3d 1108, 1109-10 (1986) (no right to speedy trial in forfeiture action under section 36—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 36—1) because it is not a criminal action).

Respondent cites *People v. Beshears,* 65 Ill. App. 2d 446 (1965), and *People v. McVeay,* 302 Ill. App. 3d 960 (1999), as support for his contention that the Speedy Trial Act applies to the SDPA. Respondent's reliance on those cases, however, is misplaced.

The court in *Beshears* did not hold that the Speedy Trial Act applies to the SDPA. While the court discussed the language of section 103—5, it did so in the context of deciding whether the exception for competency hearings set forth in section 103—5 applied in that case. See *Beshears,* 65 Ill. App. 2d at 458. The court otherwise never mentioned section 103—5 or its 120-day requirement. Rather, the court in *Beshears* held that the respondent had a due process right to a speedy trial. In that regard, the court stated that "it is quite clear how the requirements of *due process* were violated." (Emphasis added.) *Beshears,* 65 Ill. App. 2d at 459. The court further noted that Illinois courts "have frequently admonished that *due process of law* must be followed in proceedings conducted under the [SDPA]." (Emphasis added.) *Beshears,* 65 Ill. App. 2d at 459. The court concluded, therefore, that because the respondent had been in custody for about nine months "it cannot be said that *due process of law* has been met." (Emphasis added.) *Beshears,* 65 Ill. App. 2d at 459 . There is no explicit language in *Beshears* that the Speedy Trial Act applies. At best, the reliance on section 103—5 is equivocal as the holding is based on due process rather than the Speedy Trial Act itself.

We further note that our supreme court has stated that "the right to due process" entitles a respondent in an SDPA proceeding "the right to a speedy trial." *People v. Trainor,* 196 Ill. 2d 318, 328-29 (2001); *United States ex rel. Stachulak v. Coughlin,* 520 F.2d 931 (7th Cir. 1975). A reading of the *Coughlin* case indicates that the court of appeals ruled that "principles of due process in general must govern proceedings brought under the Sexually Dangerous Persons Act." *Coughlin,* 520 F.2d at 935. In stating that the Illinois courts have accorded some of the safeguards applicable in criminal proceedings to individuals charged under the SDPA, the court of appeals distinguished statutorily recognized rights to a hearing, jury trial, and counsel from other rights such as the right to confront witnesses, the right against self-incrimination, and the right to a speedy trial. *Coughlin,* 520 F.2d at 935. As to the right to confront witnesses, *Coughlin* cites *People v. Nastasio,* 19 Ill. 2d 524 (1960), wherein the Illinois Supreme Court banned the use of depositions in proceedings under the SDPA. The

supreme court stated, "difficult *constitutional* issues would be raised by the use of depositions in proceedings which so closely resemble criminal prosecutions." (Emphasis added.) *Nastasio*, 19 Ill. 2d at 529. As authority for applying the due process right to a speedy trial to SDPA proceedings, *Coughlin* cites *Beshears*. *Coughlin*, 520 F.2d at 935. Thus, we read the *Coughlin* decision, which is cited with approval by our supreme court in *Trainor*, as interpreting *Beshears* to rely on due process rather than the Speedy Trial Act in recognizing a respondent's right to a speedy trial.

Respondent also relies on the *McVeay* decision. *McVeay*, however, does not expressly address the issue of whether the Speedy Trial Act applies to the SDPA. Rather, in discussing the issue of whether the SDPA gives a respondent the right to retain, or have appointed, his own psychiatric expert, this court noted that certain procedural safeguards have been afforded to respondents involved in proceedings under the SDPA. *McVeay*, 302 Ill. App. 3d at 964. In doing so, this court stated, by way of example, that where a respondent is held for more than four months on a criminal charge and cannot be prosecuted, then the charge cannot serve as the basis for proceeding under the SDPA. *McVeay*, 302 Ill. App. 3d at 964, citing *People v. Beshears*, 65 Ill. App. 2d 446 (1965). We do not read *McVeay* as clear authority for the proposition that the Speedy Trial Act applies to the SDPA, nor is it a ringing endorsement of the *Beshears* case in that regard.

■ Based on the foregoing, we hold that the Speedy Trial Act does not apply to a proceeding under the SDPA. Thus, respondent was not prejudiced by his trial counsel's failure to raise the statutory speedy trial issue and was not, therefore, denied the effective assistance of counsel in that regard.

■ As for respondent's contention based on a due process right to a speedy trial, we also conclude that his counsel's failure to raise that issue in the trial court did not result in prejudice to respondent. As noted in *Trainor*, a respondent has a due process right to a speedy trial in a proceeding under the SDPA. We emphasize, however, that the due process right to a speedy trial in this context does not implicate the specific speedy trial provisions of the Illinois or United States Constitution. By their express terms, those provisions apply only to criminal prosecutions. See U.S. Const., amend. VI ("[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy *** trial"); Ill. Const. 1970, art. I, § 8 ("[i]n criminal prosecutions, the accused shall have the right to *** have a speedy public trial"). While the due process right to a speedy trial is not the same as the right to a speedy trial under the above provisions of the state or federal constitution, we consider the analysis accorded to the sixth amendment right to a

speedy trial to provide meaningful guidance as to whether a respondent in a "sexually dangerous person" proceeding has been denied his procedural due process right to a speedy trial.

The sixth amendment right to a speedy trial is fundamental and is made applicable to state proceedings via the due process clause of the fourteenth amendment. *People v. Crane*, 195 Ill. 2d 42, 46 (2001). The nature of the speedy trial right, however, is generically different from other constitutional rights. *Crane*, 195 Ill. 2d at 46, citing *Barker v. Wingo*, 407 U.S. 514, 519, 33 L. Ed. 2d 101, 110, 92 S. Ct. 2182, 2186 (1972). It differs from the other rights because its deprivation sometimes works to the advantage of the defendant and against the State; for example, delay is often used as a defense tactic. *Crane*, 195 Ill. 2d at 47. Thus, deprivation of the right to a speedy trial does not *per se* prejudice the defendant's ability to defend himself. *Crane*, 195 Ill. 2d at 47. Further, because the constitutional speedy trial right is more vague, which makes it impossible to determine with precision when the right has been denied, a functional analysis of the right is necessary within the context of a particular case. *Crane*, 195 Ill. 2d at 47. Finally, because the remedy for a speedy trial violation requires that a defendant go free, the right to a speedy trial should always be in balance and consistent with the public's right to justice. *Crane*, 195 Ill. 2d at 47.

■ To address these concerns, the United States Supreme Court identified four factors that must be balanced in determining whether a defendant's right to a speedy trial has been violated. *Crane*, 195 Ill. 2d at 48, citing *Barker*, 407 U.S. at 530, 33 L. Ed. 2d at 116-17, 92 S. Ct. at 2192. The four factors are: length of the delay, reasons for the delay, prejudice, if any, to the defendant, and the defendant's assertion of the right. *Crane*, 195 Ill. 2d at 48.

While these factors were developed in the context of the sixth amendment right to a speedy trial, we consider them relevant in deciding whether a respondent in a "sexually dangerous person" proceeding has been denied his due process right to a speedy trial. In fact, *Beshears* applied two of the four factors, length of the delay and reason for the delay. Therefore, we will consider the *Barker* factors here in deciding whether respondent was denied his due process right to a speedy trial.

■ Applying these factors to the case at hand, we hold that respondent was not denied his constitutional right to a speedy trial. First, respondent was in custody just over a year prior to his hearing commencing under the SDPA. While, standing alone, such a delay might be troubling, here there were understandable reasons for the delay, which bring us to the second factor.

Respondent shares responsibility for some of the delay. He agreed to continue his criminal trial from September 13, 1999, to October 13, 1999, and he moved to continue his criminal trial from October 13, 1999, to November 29, 1999. On November 4, 1999, he filed a motion to suppress statements. Additionally, respondent requested to continue the March 21, 2000, and June 5, 2000, trial dates in the SDPA proceeding.

Further, the State needed time to prepare the child victims for trial and also needed time to have respondent evaluated by the psychiatric experts. There is no evidence of any inordinate delay in that process. In fact, we note that respondent himself injected some delay by not initially cooperating with one of the psychiatrists.

Additionally, while respondent makes much of the fact that the State did not begin proceedings under the SDPA until after he succeeded on his motion to suppress certain statements he made to the police, that delay is understandable, as the State's view of its case would certainly have been affected by the suppression of those statements. It was respondent who sought such suppression, and, while he was certainly entitled to do so, he protracted the proceedings by filing the motion several months after his arrest and prompting the State's reassessment of its case once the motion was decided in his favor. The reasons cited for prolonging the time in this case mitigate against a finding of a speedy trial violation.

As for prejudice to respondent, other than the time he spent in custody, he points to no other prejudice in terms of his defense of his case. We also do not identify any such prejudice in the record. Thus, this factor weighs in favor of ruling that no speedy trial violation occurred.

Lastly, respondent never asserted his speedy trial right in the trial court. He never moved to dismiss either the criminal charges or the SDPA petition on speedy trial grounds. He did file a demand for a speedy trial under the Speedy Trial Act on December 30, 1999, but it was directed at the criminal charges only. Respondent never demanded a speedy trial on the SDPA petition. We consider respondent's assertion of his right to be minimal in this case.

When we weigh the four factors collectively, we hold that respondent was not denied his constitutional due process right to a speedy trial in the SDPA proceeding. Thus, respondent was not prejudiced by his trial counsel's failure to raise the constitutional speedy trial issue and, therefore, was not denied the effective assistance of counsel in that regard.

■ We next address the issue of whether it was error to allow one of the State's experts to rely on and testify about a plethysmograph

examination given to respondent as part of his evaluation under the SDPA. We begin by noting that the State contends that respondent waived this issue because he never objected at trial or in his posttrial motion to the expert's reference to, and reliance upon, the plethysmograph test results, nor did he seek a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Respondent concedes waiver, but, in an effort to avoid the waiver, he contends that the error was plain. Further, respondent maintains that he should not be barred from raising the plethysmograph issue because any waiver was attributable to the ineffectiveness of his trial counsel.

■ Plain error is a limited and narrow exception to the general waiver rule, to be invoked only where the evidence is closely balanced or the alleged error is so substantial that it deprived the defendant of a fair trial. *People v. Kuntu*, 196 Ill. 2d 105, 128 (2001). We begin by determining if there was error of any sort in admitting the expert testimony based on the plethysmograph.

■ The exclusive test for the admission of expert testimony based on scientific methods is governed by *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76-77 (2002). Under the *Frye* test, scientifically based opinions are admissible at trial only if the methodology or scientific principle upon which the opinions are based is sufficiently established to have gained general acceptance in the particular field in which it belongs. *Donaldson*, 199 Ill. 2d at 77. If the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the field, the fact finder may consider the opinion. *Donaldson*, 199 Ill. 2d at 77.

The *Frye* test need be applied only if the scientific principle, technique, or test offered by the expert to support his conclusion is new or novel. *Donaldson*, 199 Ill. 2d at 78-79. Once a principle, technique, or test has gained general acceptance in the particular scientific community, its general acceptance is presumed in subsequent litigation. *Donaldson*, 199 Ill. 2d at 78.

In this case, Wilson testified that the plethysmograph consisted of a gauge placed around the penis of the subject that measures changes in the circumference of the penis when the subject is exposed to video or audio stimuli. The theory is that the penis will increase in circumference when the subject is sexually aroused by certain stimuli.

Wilson testified that he relied, in part, on the plethysmograph test results, which showed respondent to have a 35% increase when shown pictures of prepubescent girls and a 20% increase when shown pictures of adolescent girls, in arriving at his ultimate opinion that respondent was a pedophile and sexually dangerous. According to Wilson, a 10%

increase in penile circumference is the threshold for indicating sexual arousal.

There was no determination under *Frye* in this case regarding the general acceptance of using a plethysmograph to measure sexual arousal and as the basis for an opinion as to whether a subject is suffering from a sexual disorder or is sexually dangerous. Nor has our research uncovered a case in Illinois where the *Frye* test has been applied to such a methodology.

There is a dearth of Illinois cases that mention plethysmography. In *People v. Cole*, the court stated in *dicta* that a qualified psychiatrist could diagnose a mental disorder for purposes of the SDPA based on, among other things, "a physical test like penile plethysmography." *People v. Cole*, 299 Ill. App. 3d 229, 234 (1998). The respondent in *Cole* was not subjected to the test, there was no mention of *Frye*, and the court did not address the admissibility of an opinion based on the technique. *Cole* does not support the admissibility of Wilson's opinion in this case.

In *People v. Johnson*, 322 Ill. App. 3d 117 (2001), one of the experts who examined the respondent as part of a proceeding under the SDPA relied, in part, on the results of a plethysmograph. This court, however, had no occasion to consider the admissibility of the expert's opinion on appeal and offered no opinion as to the general acceptance of the technique. Further, there is no mention of *Frye* in the decision. The *Johnson* case sheds no light on the issue of the admissibility of an expert opinion based on a plethysmograph.

In *People v. Swanson*, 335 Ill. App. 3d 117 (2002), this court held that the respondent's counsel in a proceeding under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 1998)) was deficient for failing to object to the admission of testimony concerning the results of a plethysmograph. Our holding was based on the absence of any consideration in Illinois of the scientific validity of such a test. *Swanson*, 335 Ill. App. 3d at 127.

Because there was no *Frye* determination in this case, and no such prior determination in any reported case in Illinois, it was error to allow Wilson to base his opinion on the results of the plethysmograph.

Having so concluded, we need not decide whether this error was plain or whether respondent's counsel was ineffective for failing to object to the admission of Wilson's opinion based on the plethysmograph. Were we to conclude that the error was plain or that counsel was ineffective, respondent's remedy would be a new hearing and, as we will explain below, we are remanding this cause for a new hearing pursuant to *Masterson*.

■ The last issue raised by respondent is whether the SDPA is constitutionally defective because it allows the commitment of a person without a finding that the person has a serious difficulty in controlling behavior. Subsequent to our now-vacated initial opinion in this cause, our supreme court handed down its decision in *Masterson*. In similar fashion to respondent in this case, the respondent in *Masterson* argued that his commitment under the SDPA should be reversed because the evidence was insufficient to satisfy the constitutional requirements set forth in *Hendricks* and *Crane*, and he suggested that the SDPA is constitutionally infirm if it is interpreted as not requiring a separate lack of control finding. *Masterson*, 207 Ill. 2d at 317-18.

The *Masterson* court pointed out that section 1.01 of the SDPA defines the term "sexually dangerous persons" as follows:

" 'All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children ***.' " *Masterson*, 207 Ill. 2d at 318, quoting 725 ILCS 205/1.01 (West 1998).

After concluding "that section 1.01 of the Illinois SDPA (725 ILCS 205/1.01 (West 2000)), in its current form, meets minimal constitutional standards as expressed in *Hendricks*," the *Masterson* court held that the SDPA has "significant ambiguities that impact its compliance with the Court's most recent pronouncement in *Crane*." *Masterson*, 207 Ill. 2d at 328. The *Masterson* court identified two such ambiguities. First, the court noted that the SDPA does not define the term "mental disorder" (*Masterson*, 207 Ill. 2d at 319) to specifically link that term to "the volitional standard for commitment that emerges from *Crane*," that is, " 'serious difficulty controlling behavior' " (*Masterson*, 207 Ill. 2d at 322, 328). Second, the SDPA does not contain an explicit standard addressing the probability or likelihood that the subject of the proceedings will engage in sexual offenses in the future. *Masterson*, 207 Ill. 2d at 319, 328.

The *Masterson* court noted, however, that the Illinois Sexually Violent Persons Commitment Act (SVPA) (725 ILCS 207/1 *et seq.* (West 2000)) addresses these specific areas. First, the SVPA defines "mental disorder" in such a way that the volitional standard for commitment is met. Specifically, the SVPA defines "mental disorder" as " 'a congenital or acquired condition affecting the emotional or *volitional capacity* that predisposes a person to engage in acts of sexual violence.' " (Emphasis in original.) *Masterson*, 207 Ill. 2d at 319, quoting 725 ILCS 207/5(b)

(West 2000). Second, the SVPA requires that the trier of fact find that the subject of the proceeding " 'is dangerous because he or she suffers from a mental disorder that makes it *substantially probable* that the person will engage in acts of sexual violence.' " (Emphasis in original.) *Masterson*, 207 Ill. 2d at 319, quoting 725 ILCS 207/5(f) (West 2000).

The *Masterson* court cited authority for looking to similar statutes to aid construction and for presuming that statutes relating to the same subject are governed by one spirit and a single policy, and concluded that "Illinois' SDPA and SVPA are obviously closely related in subject and proximity, and they are undoubtedly governed by one spirit and a single policy." *Masterson*, 207 Ill. 2d at 329. The court held that "it is merely a matter of legislative oversight that the SDPA has not been amended to make its terminology consistent with the SVPA." *Masterson*, 207 Ill. 2d at 329. The court cited authority for the proposition that "[w]hen the intent of the legislature is otherwise clear, the judiciary possesses the authority to read language into a statute which has been omitted through legislative oversight," and then stated:

> "In accordance with that authority, we believe the SVPA's defini-
> tion of 'mental disorder' should be read into the SDPA to the extent
> consistency allows and augmented with the standard that appears
> to emerge from *Crane*. Thus, we construe the term 'mental
> disorder,' as used in the SDPA, to mean a congenital or acquired
> condition affecting the emotional or volitional capacity that
> predisposes a person to engage in the commission of sex offenses
> and results in serious difficulty controlling sexual behavior."
> *Masterson*, 207 Ill. 2d at 329.

With respect to the SDPA's ambiguity regarding the requirement that a person must present a danger to offend in the future before he or she may be committed under the SDPA, the *Masterson* court stated:

> "Again, consistency dictates utilization of the standard set forth in
> the SVPA (725 ILCS 207/5(f) (West 2000)), thus making explicit
> what, perhaps, has been heretofore implicit. Thus, a finding of
> sexual dangerousness premised upon the elements of section 1.01
> of the SDPA (725 ILCS 205/1.01 (West 2000)) must hereafter be ac-
> companied by an explicit finding that it is 'substantially probable'
> the person subject to the commitment proceeding will engage in
> the commission of sex offenses in the future if not confined."
> *Masterson*, 207 Ill. 2d at 330.

In the case at bar, respondent's commitment hearing, like the respondent's in *Masterson*, took place before the United States Supreme Court handed down its decision in *Crane* and before our supreme court handed down its decision in *Masterson*. Accordingly, as

was deemed necessary in *Masterson*, we remand this cause to the circuit court for a new hearing wherein the parties will have the opportunity to adduce evidence pertinent to the applicable standards announced. See *Masterson*, 207 Ill. 2d at 330. We note that the evidence adduced at the original commitment hearing was constitutionally sufficient to justify commitment under the standards then existing. See *Masterson*, 207 Ill. 2d at 331.

## CONCLUSION

The judgment of the circuit court of Lake County is reversed and the cause is remanded to the circuit court for proceedings consistent with this opinion.

Reversed and remanded.

BOWMAN and GROMETER, JJ., concur.