2024 IL App (4th) 230269

NO. 4-23-0269

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 10, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Woodford County |
| MAYA D. NODINE, | ) | No. 21CF195 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court, with opinion.
Justices Zenoff and Vancil concurred in the judgment and opinion.

**OPINION**

¶ 1    On March 6, 2023, a jury convicted defendant, Maya D. Nodine, of first degree murder. On March 22, 2023, the trial court sentenced defendant to 30 years in prison. Defendant appeals, making the following arguments: (1) the evidence presented at trial was insufficient to prove defendant guilty of first degree murder, where the State presented no evidence defendant was " 'consciously aware' " of the risk involved to another; (2) defendant's right to counsel under the sixth amendment to the United States Constitution (U.S. Const., amend. VI) was violated; (3) the court erred by (a) barring defendant's expert testimony, (b) refusing to provide the jury with the Illinois Pattern Jury Instructions for "recklessness," and (c) failing to accurately answer a jury question during its deliberations; (4) the court imposed an excessive sentence; and (5) defense counsel provided ineffective assistance by failing to provide the court with mitigating evidence relating to defendant's mental health and young age at defendant's sentencing hearing. Because

defendant's trial counsel had a *per se* conflict of interest, we reverse defendant's conviction and remand this case for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3            On December 21, 2021, the Woodford County State's Attorney's Office charged defendant by information with one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)) for causing the death of Joy Hattan. The State alleged defendant, without lawful justification, turned her vehicle into oncoming traffic, "knowing at the time such act created the strong probability of death or great bodily harm to the defendant or another individual." On January 6, 2022, a grand jury indicted defendant for the same offense.

¶ 4            The trial court initially appointed attorney Andrew Lankton to represent defendant. However, on February 1, 2022, attorney Maureen Williams filed a motion for substitution of counsel on defendant's behalf. The court entered an order on March 9, 2022, allowing attorney Lankton to withdraw and attorney Williams to enter her appearance as substitute counsel.

¶ 5            Defendant's first trial was held in September 2022. During the jury's deliberations, one juror was excused from service because she was using her watch to communicate during deliberations. After an alternate jury replaced the excused juror, the jury found defendant guilty but mentally ill of first degree murder.

¶ 6            On January 19, 2023, defendant filed a motion for leave to file an amended motion for a new trial, which was later granted. At a hearing on February 9, 2023, the trial court granted defendant's amended motion for a new trial. After rejecting most of defendant's arguments, the court addressed the jury's deliberations, stating:

> "The case law says that when I put [an] alternate juror in I am to ask the juror a
>
> question. And if I had to put nearly my life savings on the line[,] I would have put

it, because I've done this before, and I've always asked the juror did you follow my instructions. I—in my mind I seem to have a recollection of that, but in the record it is not there. I did not ask the juror prior to inserting her into the jury whether or not she followed my instructions. So that was a mistake. And for that I'm going to grant a new trial to the defendant because the case law is clear."

The court found "there was ample evidence sufficient to convict the defendant such that another trial can take place."

¶ 7　　　　The trial court then indicated the case was going on the court's February 27, 2023, jury calendar and stated a pretrial hearing would be held either on February 15 at 11:30 a.m. or February 17 at 11:30 a.m. Attorney Williams indicated she had a scheduling conflict on February 17 but stated the February 15 date might work. The court responded, "One of them is going to work, right? Because it's going to happen." Attorney Williams asked if she could step out and call someone, presumably to check her calendar. The court responded, "Very very quickly. Like, super quick. We will be in recess." When attorney Williams returned, the pretrial hearing was set for 10:30 a.m. on February 15.

¶ 8　　　　Attorney Williams then told the trial court she had a jury trial in La Salle County on February 27. The court responded:

"I'm not going to listen to any continuances. This case is going to take priority. So I'm not—just—I don't—move your mountains, do whatever you need to do. This is a very serious case, your client has been in custody a long time, and this case is going forward. If you need a—as you know, I do a rolling calendar, so that's why I said I'm going to set aside time the following week if need be. So if you can try a case earlier in La Salle County, or wherever, that's fine. But in that

week to the week[-]and-a-half time frame this case is going. Okay?"
Attorney Williams responded she could do the week after the week of February 27. She continued, "It's just the 27th—I tried to get out of that case yesterday, and the judge wouldn't let me." The court indicated they would talk about that further at the pretrial hearing on February 15.

¶ 9    On February 14, 2023, attorney Williams filed a motion to substitute Judge Feeney, who had been presiding over defendant's case, for cause pursuant to section 114-5(d) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-5(d) (West 2022)). The motion alleged that the judge had a predisposition toward defendant's guilt because he had "consistently precommitted himself to the mistaken legal conclusion that suicidal intent *ipso facto* proves homicidal intent." In addition, attorney Williams alleged:

> "The [trial judge's] rejection of suicidal intent v. homicidal intent, insistence of instruction on [guilty but mentally ill], handling of the jury questions, refusal to give the statute/IPI description for 'knowing,' and comments throughout the trial that [d]efendant's actions were *ipso facto* intentionally homicidal though that burden was on the State to prove all made clear that [the judge] had a predisposition toward guilt before the first jury began its deliberations."

According to the motion, the judge would likely inject the same errors into defendant's new trial. Further, the motion alleged the judge was unwilling to preserve the original record. In her affidavit, attorney Williams stated:

> "Undersigned counsel recalls conversations [she] had with [the judge which] would indicate the Court's position but were not part of the official record, and therefore not transcribed. The same may have been interpreted by the court reporter not to have been part of the official record. However, the conversations

would be helpful to show the course of conversation and indications by [the judge] as to his rulings."

¶ 10 On February 15, 2023, at 8:33 a.m., attorney Williams filed an amended motion for substitution for cause. That same day, a different judge, Judge Michael Stroh, was assigned to hear the motion to substitute.

¶ 11 On February 21, 2023, after Judge Stroh was assigned to hear the motion, attorney Williams filed yet another amended motion to substitute for cause. In this motion, defense counsel acknowledged her own pending case before the trial court and added the following assertion:

"Counsel notes that she is *** on probation under [the] direct supervision of this very judge who sentenced her on 2/25/21. A petition to revoke was filed on [February 15, 2023]. 20[-]CF[-]89. At best, it compromises the relationship of this lawyer in this particular court. My ability to fully represent my client seems compromised. Although the matter was fully disclosed to client, I do not want to create an unnecessary error."

¶ 12 On February 23, 2023, attorney Williams filed a motion to withdraw as counsel pursuant to Illinois Supreme Court Rule 13 (eff. Jan. 1, 2023). The motion provided no explanation why counsel wanted to withdraw.

¶ 13 That same day, at the hearing on defendant's motions to substitute Judge Feeney for cause, attorney Williams asked Judge Stroh to first address her motion to withdraw as counsel before hearing arguments on the motion for substitution. Judge Stroh denied the request because he was only assigned to hear the motion for substitution. Attorney Williams then asked to withdraw the motion for substitution. When questioned by Judge Stroh about withdrawing the motion, defendant initially said she would go along with attorney Williams's request. Upon further

explanation by Judge Stroh, defendant said she *did not* want the motion withdrawn. Attorney Williams then asked Judge Stroh:

> "Your Honor, is it possible to have a—to withdraw these motions—this motion? It was an original motion and then it was amended twice. Is it possible to have the motions amended and then at a later time [defendant] can file them? I think that's what the holdup is?"

Judge Stroh said he could not advise defendant on that question. Defendant then said she was okay with withdrawing the motion for substitution. On defendant's motion, Judge Stroh then allowed defendant to withdraw the motion for substitution and referred the case back to Judge Feeney. We note the record is devoid of any order memorializing Judge Stroh's ruling on defendant's motion to withdraw the motion for substitution. Judge Stroh's docket entry only indicates defendant moved to withdraw her motions, and the trial court granted the request after questioning defendant.

¶ 14          At a hearing on February 27, 2023, after the case was transferred back to Judge Feeney, the trial court noted attorney Williams had filed a motion to withdraw as defendant's attorney without stating any reasons for the request. Attorney Williams then told the court she and defendant had a breakdown in communication. When the court asked who would represent defendant, attorney Williams stated defendant was asking for a public defender. The court then asked defendant what she saw as the breakdown in communication. Defendant replied, "I just— I'm never able to get ahold of her. I don't know." Defendant also said she had seen people on the Internet comment that she would have been found not guilty if attorney Williams was not her attorney. According to defendant, she believed she would do better with a public defender. The court responded critics on the Internet did not know the facts of defendant's case.

¶ 15          The trial court then asked the State if it had a position on the motion to withdraw.

The State responded:

> "Typically[,] I don't, but in this case I am objecting, Judge. It's just—it just seems like looking at the history of this case—now—I didn't know exactly. Now hearing this causes me to pause a little bit more. But I—for the record, I will object."

Neither the State, nor attorney Williams, nor defendant said anything about attorney Williams's allegation in her motion to substitute Judge Feeney for cause that attorney Williams was a defendant who had been sentenced to a term of probation by Judge Feeney and that a petition to revoke attorney Williams's probation had been filed by the Woodford County State's Attorney's Office on February 15, 2023, in case No. 20-CF-89, with a notice to appear set for March 17, 2023. Further, attorney Williams did not indicate to Judge Feeney that she had earlier asserted her ability to fully represent defendant "seems compromised," as she stated in the amended motion to substitute the judge for cause.

¶ 16    The trial court denied defense counsel's motion to withdraw, providing the following explanation:

> "I'm not convinced, quite honestly. We've already tried this case. And not only have we tried it, we—we were going to go to sentencing. The defense files a motion for new trial, and I grant it, and now you tell me you can't go forward because you two can't get along or you can't communicate, or something.
>
> I'm not—and I will add to that my concern is for the whole fiasco, quite honestly, Ms. Williams, that went on where you file I don't even know how many motions to sub me for cause—very serious matter to do that—and then withdraw them before they can even be heard. So I'm not convinced that this isn't some effort to—instead of asking me for a continuance or instead of—I don't know what this

is. But I'm not convinced that you two can't get along.

I have personally observed on numerous occasions at pretrials and other hearings in which Ms. Williams—and we've made [defendant] available back here, and they've had lengthy conversations. And, of course, [defendant] is always available in the conference room in the jail. So I'm not—I'm not buying it. The motion to withdraw is denied."

¶ 17 After the trial court indicated the court would be in recess, Judge Feeney overheard attorney Williams make a comment and asked what she had said. Attorney Williams responded, "I said it's special Maureen Williams' treatment." Judge Feeney then asked why she made that statement. Attorney Williams responded, "Your Honor, I have never heard of a situation where a person has asked to be off a case because the client wants me to be—and then, you know, the review that was posted right after the last trial scared her to death." The judge indicated the Internet criticism was "garbage," challenged attorney Williams to point to one time where he had not treated her appropriately, and indicated he resented attorney Williams "making these chide little remarks that are demeaning to me and the court," noting the comments were inappropriate and unprofessional. Attorney Williams apologized, indicating she did not intend for the court to hear her comment. The court and attorney Williams then had the following exchange:

"THE COURT: Do you understand my point? It isn't whether you mean for me to hear it. You are—you are in—when you walk through that bar as a member of our honored profession you have a duty. This is your courtroom. This is your place where you work.

[ATTORNEY WILLIAMS]: I—I don't think I—I think my client would [be] better off with the public defender *in this county*, and I think she believes that.

- 8 -

> THE COURT: Well, I—she has hired you. You have taken her money, and you have committed yourself to this case, and I'm not—and none of that excuses you making those remarks leaving this hollowed [*sic*] space.
>
> [ATTORNEY WILLIAMS]: You're absolutely right, Judge. I apologize."

(Emphasis added.)

Attorney Williams again failed to tell Judge Feeney that she had moved to substitute him for cause, in part, because she was on felony probation and the same state's attorney's office prosecuting her client was proceeding on a petition to revoke her probation. Although Judge Feeney indicated he knew attorney Williams had filed multiple motions to substitute him for cause, which he characterized as a "very serious matter," the record does not indicate Judge Feeney read or reviewed the content of those motions.

¶ 18        Defendant's second jury trial commenced March 1, 2023. The following is a brief summary of some of the evidence presented during the trial. Joy Hattan died as a result of a two-car collision with defendant. Volunteer firefighter and emergency medical technician Scott Ireland testified he arrived at the scene of the crash sometime after 5 p.m. He spoke with defendant while she was still in her vehicle. According to Ireland, while he was treating defendant, she said she purposefully drove her vehicle into oncoming traffic to commit suicide. Defendant was taken to a hospital by ambulance.

¶ 19        Deputy sheriff Sarah Lamlech testified she also responded to the scene. She talked to defendant, who seemed upset, aware of her surroundings, and complained of pain. Deputy Lamlech asked defendant what happened. Defendant responded that she tried to commit suicide by swerving into traffic. Additionally, defendant said she was sorry and asked if the other driver was alright.

¶ 20 Detective Albert Holocker testified he questioned defendant at the hospital after she was informed of her *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)). Defendant told the detective she wanted to kill herself.

¶ 21 Officer Christopher McClenning of the Illinois State Police's traffic reconstruction unit offered expert testimony that the victim's vehicle was traveling at a constant rate of between 53 to 57 miles per hour five seconds before the crash. He determined defendant's car was traveling at 88 miles per hour and accelerated up to 94 miles per hour before the collision. Officer McClenning also determined the collision occurred in Hattan's lane of traffic.

¶ 22 Defendant's mother, Trisha Taylor, testified defendant was sexually assaulted in 2020. On the day of the crash, she and defendant had a heated conversation about defendant hanging out with a 16-year-old girl. Taylor testified she told defendant she was concerned defendant could get in trouble because of the girl's age, reminding Maya of her own sexual assault. Defendant was crying and very upset.

¶ 23 Defendant testified on her own behalf. According to defendant, she was sexually assaulted when she was 17 years old. She became suicidal and attempted to end her life a couple of weeks after the assault. Her argument with her mother on December 16, 2021, made her anxious. Because her dab pen was dead, she was unable to smoke marijuana to calm down. Instead, she went for a drive. According to defendant, she did not intend to kill herself when she went for the drive and usually drove fast. While driving, she had a panic attack. Then she suddenly felt very calm and had a moment of blankness. She saw the headlights of another car and swerved. According to defendant, she wanted to die. After the accident, she realized she might have hurt someone in the other car. She claimed the idea of someone else being hurt in the accident did not cross her mind until the crash was over.

¶ 24          On March 6, 2023, the jury found defendant guilty of first degree murder.

¶ 25          At defendant's sentencing hearing on March 22, 2023, Judge Feeney indicated he had received the presentence investigation report. Neither the State nor attorney Williams provided any additions or corrections to the report. The trial court then asked the State if it had additional evidence. Without objection from defendant, the State presented a request for restitution for funeral expenses and a statement from the victim's husband.

¶ 26          Judge Feeney then turned his attention to attorney Williams. The report of proceedings only indicates she shook her head. The trial court then asked attorney Williams, "Case—you have no case in mitigation?" Attorney Williams responded, "No." Defendant did make a statement on her own behalf.

¶ 27          Judge Feeney then allowed the State to present its argument with regard to defendant's sentence. After the State finished, the trial court indicated it was attorney Williams's turn to present argument on defendant's behalf. Attorney Williams told the court, "I don't believe that anything I say is going to influence the court." The court responded it would listen and consider everything attorney Williams had to say and noted attorney Williams was defendant's advocate. Attorney Williams then told the court:

> "Thank you. I would just like to—I know it really came up in the first trial when I fought so hard against the guilty but mentally ill instruction. The court had asked if I thought that maybe that might not help at sentencing to have that—to have that verdict form in front of the jury. And so I would just like to ask the court to take into account that this was a person who had a terrible occurrence that happened to her a year[-]and-a-half before this. She did not anticipate leaving her house to attempt suicide. It was just a situation—a situation where at the last second

she decided to swerve into a car. And she will live with that regret for the rest of her life, I have no doubt.

So I would ask the court to—to sentence my client to the minimum. Thank you."

¶ 28    The trial court then sentenced defendant to 30 years in prison, imposed a $15,000 fine and mandatory assessments, and ordered defendant to pay restitution in the amount of $7715.14. Attorney Williams did not file a motion to reconsider defendant's sentence, stating defendant did not intend to challenge her sentence.

¶ 29    This appeal followed.

¶ 30                            II. ANALYSIS

¶ 31    Defendant raised multiple issues on appeal. We first address her argument she was denied her sixth amendment (U.S. Const., amend. VI) right to conflict-free counsel in the trial court.

¶ 32               A. Defendant's Right to Conflict-Free Counsel

¶ 33    Defendant argues her trial counsel, attorney Williams, had either a *per se* or actual conflict of interest. Defendant's case was prosecuted by the Woodford County State's Attorney's Office and presided over by Judge Feeney. When attorney Williams agreed to represent defendant, she had already pled guilty to a felony forgery charge brought by the Woodford County State's Attorney's Office in Woodford County case No. 20-CF-89, and Judge Feeney had accepted her plea and sentenced her to a two-year term of second-chance probation, which attorney Williams was still serving.

¶ 34    Six days after Judge Feeney indicated he was required to grant defendant a new trial because the record indicated the trial court had not properly questioned a replacement juror

during defendant's first trial, the Woodford County State's Attorney's Office filed a petition to revoke attorney Williams's probation. Subsequently, Judge Feeney denied attorney Williams's motion to withdraw as defense counsel in this case. As a result, defendant argues she was forced to go through her second trial and posttrial proceedings with an attorney who had either a *per se* or an actual conflict of interest.

¶ 35 Citing *People v. Johnson*, 322 Ill. App. 3d 117, 121 (2001), the State argues that attorney Williams did not have a *per se* conflict of interest in this case. In *Johnson*, the defendant's attorney had also been prosecuted by the same state's attorney's office that was prosecuting the defendant in that case, pleaded guilty to an offense, and was placed on probation for two years. *Id.* The state's attorney's office also filed a complaint against the attorney with the Illinois Attorney Registration and Disciplinary Commission. *Id.* While on probation, defense counsel represented the defendant during some pretrial matters and throughout the defendant's trial. *Id.*

¶ 36 The defendant in *Johnson* argued his defense attorney was operating under a *per se* conflict of interest because both he and his attorney were being prosecuted by the same state's attorney's office. *Id.* According to the defendant, "this created a situation in which [his attorney] was likely to temper his efforts on defendant's behalf so as not to anger" the state's attorney's office. *Id.*

¶ 37 On appeal in *Johnson*, the Second District acknowledged the state's attorney's office prosecuting the defendant would have prosecuted any alleged probation violation committed by the defendant's attorney. *Id.* However, the Second District indicated that our supreme court's decision in *People v. Spreitzer*, 123 Ill. 2d 1, 14-15 (1988), "explained that the *per se* rule is applied in cases involving a direct conflict between the interests of two opposing clients or between a present client and a past personal commitment." *Johnson*, 322 Ill. App. 3d at 122. According to

the Second District, the facts in *Johnson* did not fall within the situations the supreme court had identified as *per se* conflicts of interest. *Id.* The appellate court explained:

"Those cases all involved situations in which an attorney had acted or was acting in a representative capacity for clients with opposing interests. Here, defendant argues that the conflict arose because defendant and his attorney were both being prosecuted by the same entity. Defendant contends that his case is similar to *Kester* [(*People v. Kester*, 66 Ill. 2d 162 (1977))], in which the supreme court found that a *per se* conflict of interest was created by the defense attorney's prior association with the prosecution. *Kester* is entirely distinguishable. In that case, the defense attorney previously had been employed by the Peoria County State's Attorney and had actually participated in the prosecution of the defendant. The court held that prejudice would be presumed in a situation in which 'a prosecutor who personally has been involved in the prosecution of a defendant in a particular criminal proceeding later assumes the duties of court-appointed defense counsel for that defendant in the same proceeding.' [*Id.* at 167]. *The situation here is unlike any of those in which our supreme court has found a per se conflict of interest, and therefore we must reject defendant's argument.*" (Emphasis added.) *Id.*

¶ 38    While relying on *Johnson*, the State concedes our supreme court's analysis regarding *per se* conflicts of interest has changed since *Johnson* was decided. Regardless, the State maintains this court should follow *Johnson* and find a *per se* conflict does not exist because defendant has failed to show her trial counsel suffered any actual fear of retaliation.

¶ 39    In addition to the changes in the law regarding *per se* conflicts, defendant argues that the situation before this court is distinguishable from *Johnson* because the Woodford County

State's Attorney's Office had actually filed a petition to revoke attorney Williams's probation on February 15, 2023, which was six days after Judge Feeney granted defendant a new trial. As a result, the same state's attorney's office prosecuting defendant was also pursuing the revocation of attorney Williams's probation. The state's attorney's office's revocation petition, if granted, could potentially threaten attorney Williams's freedom. From that point forward, through defendant's second trial and the posttrial proceedings that followed, attorney Williams represented defendant while this dual prosecution of these two cases continued.

¶ 40            1. *Current Illinois Law Regarding Per Se Conflicts*

¶ 41            Our supreme court recently stated, "[a] criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Yost*, 2021 IL 126187, ¶ 36.

> "Unlike other jurisdictions, Illinois law recognizes two types of conflict of interest—actual and *per se*. *People v. Fields*, 2012 IL 112438, ¶ 17; see also *Spreitzer*, 123 Ill. 2d at 14 (noting '[t]he term "*per se*" conflict does not appear in the United States Supreme Court case law, or for that matter, in cases from our sister jurisdictions')." *Id.* ¶ 37.

¶ 42            According to our supreme court in *Yost*, unlike when a defendant is alleging an actual conflict of interest,

> "a *per se* conflict does not require a defendant to establish that counsel's performance was affected by the conflict ([*People v. *]*Peterson*, 2017 IL 120331, ¶ 104) or show actual prejudice ([*People v. Hernandez*, 231 Ill. 2d 134, 143 (2008)]). A *per se* conflict of interest exists when specific facts about the defense attorney's status, by themselves, create a disabling conflict. *Fields*, 2012 IL

112438, ¶ 17. Generally, a *per se* conflict arises when defense counsel has a connection to a person or entity that would benefit from an unfavorable verdict for the defendant. *Id.* When a *per se* conflict exists, it requires automatic reversal of the criminal conviction unless the defendant waives his right to conflict-free counsel. [*People v.* ]*Green*, 2020 IL 125005, ¶ 24.

We have explained that defense counsel's association with or connection to the victim, the prosecution, or a prosecution witness may have a subtle or subliminal effect on counsel's performance that is difficult to detect and demonstrate, which justifies application of the *per se* conflict rule. *Peterson*, 2017 IL 120331, ¶ 103. We have also expressed concern that defense counsel will unnecessarily be subjected to later allegations that his or her representation of the defendant was not completely faithful. *Spreitzer*, 123 Ill. 2d at 16-17." *Id.* ¶¶ 39-40.

Currently, our supreme court recognizes three categories of *per se* conflict of interest under Illinois law: "(1) when defense counsel has a contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution; (2) when defense counsel contemporaneously represents a prosecution witness; and (3) when defense counsel was a former prosecutor who was personally involved in the prosecution of the defendant." *Id.* ¶ 66. When the record shows the facts are not in dispute, this court applies a *de novo* standard of review in determining whether an attorney has a *per se* conflict of interest. *People v. Fields*, 2012 IL 112438, ¶ 19.

¶ 43 In a recent unpublished order pursuant to Illinois Supreme Court Rule 23(b) (eff. Jan. 1, 2021), this court allowed a defendant to withdraw his guilty plea because of a contemporaneous association between the defendant's trial counsel and the prosecutor in that case.

See *People v. Abbott*, 2022 IL App (4th) 210427-U. Defendant Abbott argued his attorney, unbeknownst to him, "was operating under a claimed *per se* conflict of interest at the time she was negotiating the plea agreement with the State and counseling him regarding the terms and consequences thereof." *Id.* ¶ 32. According to the defendant, he had later learned his defense attorney was his prosecutor's mother. *Id.*

¶ 44 In finding the defendant's trial counsel had a *per se* conflict of interest, this court explained that even though the attorneys and several circuit court judges in that case relied on the Illinois Rules of Professional Conduct of 2010 to determine defendant's attorney did not have a conflict of interest, this court noted it did not need to examine the rules of professional conduct or the comments to those rules. *Id.* ¶ 36. Instead, according to this court, "[i]t is sufficient to note that defendant's appointed attorney was the mother of the prosecuting attorney and that no one disclosed this fact to defendant prior to the entry of his guilty plea." *Id.* This court held the "forever ongoing" familial relationship between a mother and daughter "unquestionably satisfies the supreme court's requirement that the connection be contemporaneous." *Id.* In addition, this court noted the defendant's attorney had a very clear connection with a person who would benefit from the defendant's conviction. *Id.* ¶ 37. This court explained:

> "It is reasonable to assume a parent, such as defendant's counsel, whether expressly or implicitly, wants her daughter (the prosecutor here) to be successful. Unfortunately, in this instance, to do so, she must achieve a result which could be seen as unfavorable for defendant. Because such a desire on counsel's part would be difficult to gauge, our supreme court has created this *per-se*-conflict-of-interest concept, where one need only provide facts about a defense counsel's status,

which, by themselves, or on their face, reveal a disabling conflict. See *People v. Spreitzer*, 123 Ill. 2d 1, 14 (1988).

Indeed, applying the supreme court's *per se* analysis to the specific facts of this case reveals that the justification for treating certain conflicts as *per se* can be exemplified by defense counsel's desire for her daughter to succeed, which, in turn, conflicts with her professional obligation to defendant. Such a conflict might ' "subliminally" affect counsel's performance in ways difficult to detect and demonstrate' (*id.* at 16 (citing *People v. Washington*, 101 Ill. 2d 104, 113 (1984))) or might possibly subject counsel to ' "later charges that [her] representation was not completely faithful" ' (*id.* at 17 (quoting *People v. Stoval*, 40 Ill. 2d 109, 113 (1968))). *Id.* ¶¶ 37-38.

¶ 45 As a result, this court held the *per se* conflict of interest in *Abbott* was automatic grounds for reversal and found the trial court erred in denying the defendant's motion to withdraw his guilty plea. *Id.* ¶ 40. According to this court, the defendant in *Abbott* presumably relied on his attorney's advice regarding whether to accept the negotiated guilty plea without knowing that "advice (1) may not have been in consideration of his best interests, as further demonstrated by [defense] counsel's failure to ensure he was properly admonished in relation to the plea, and (2) may have been tainted by counsel's desire for a favorable result for the prosecution." *Id.* ¶ 39.

¶ 46 2. *Judicial Notice of Facts in Woodford County Case No. 20-CF-89*

¶ 47 Although the State did not dispute defendant's assertions regarding attorney Williams's criminal case (Woodford County case No. 20-CF-89), the record for the case on appeal before this court did not contain all of this information. While defendant's amended motion to substitute Judge Feeney for cause did indicate attorney Williams had been sentenced to probation

- 18 -

on February 25, 2021, by Judge Feeney, was under his direct supervision, and referenced case No. 20-CF-89, the motion did not specify that case No. 20-CF-89 was a Woodford County case or involved the Woodford County State's Attorney's Office.

¶ 48 Granted, defendant's appellate counsel included the docket from Woodford County case No. 20-CF-89 in the appendix to defendant's appellant's brief. However, once again, we note the docket was not part of the trial court record in defendant's case.

¶ 49 Ordinarily, this court cannot consider case-specific information that is not a part of the record on appeal. *In re R.M.*, 2022 IL App (4th) 210426, ¶ 21. However, as noted in defendant's appellant's brief, this court can take judicial notice of public records, even if those records were not before the trial court. *Country Cos. v. Universal Underwriters Insurance Co.*, 343 Ill. App. 3d 224, 229 (2003). The docket provided by defendant's appellate counsel appears to be a public record from the Woodford County Circuit Clerk's Office. However, it is not a certified record.

¶ 50 Because of the ramifications of this court determining attorney Williams had a *per se* conflict of interest (see *Yost*, 2021 IL 126187, ¶ 39 (citing *People v. Green*, 2020 IL 125005, ¶ 24)), we thought it imprudent to rely on an uncertified record for such an important decision, even though the State did not seem to dispute the facts underlying defendant's claim attorney Williams had a *per se* conflict. As a result, on February 26, 2024, this court *sua sponte* entered the following order:

> "For purposes of this Court's review of the conflict of interest arguments raised by the appellant in her brief to this Court, the Office of the State Appellate Defender is ordered to provide this Court with a certified copy of the common law record and report of proceedings in Woodford County case No. 20 CF 89[,] *People v. Maureen Williams*[,] from the Woodford County Circuit Clerk. Any objection to this order

by either party shall be filed with this [C]ourt by March 4, 2024, with the due date
of a response to any such objection by March 11, 2024."

Neither party filed an objection to the order. On March 5, 2024, the certified common law record and report of proceedings in Woodford County case No. 20-CF-89 were filed in this court. At that time, the proceedings on the State's petition to revoke attorney Williams's probation were still ongoing.

¶ 51   On April 3, 2024, defendant filed a motion asking this court to take judicial notice of the contents of the record in Woodford County case No. 20-CF-89. The State did not object to defendant's motion. Because the certified record showed the revocation proceeding had not concluded when the certified record was prepared for this court, we decline to take judicial notice of the complete record in that case because the complete record is not before this court. However, we do grant defendant's motion in part and take judicial notice of the certified public records from Woodford County case No. 20-CF-89 that were provided to this court.

¶ 52   Those records establish that on July 21, 2020, the Woodford County State's Attorney's Office charged attorney Williams by information with one count of forgery (720 ILCS 5/17-3(a)(2) (West 2020)). According to the charging instrument, the charged offense carried a maximum possible prison sentence of five years and a maximum fine of $25,000. On August 6, 2020, a grand jury indicted attorney Williams for the same offense. On December 21, 2020, Williams waived her right to a jury trial. On February 25, 2021, Williams agreed to plead guilty to the forgery charge in exchange for the State nol-prossing a "PTR on 19TR812" and recommending Williams be sentenced to 24 months of second-chance probation subject to conditions and a $3500 fine. That same day, Judge Feeney entered an order sentencing defendant to second-chance probation for a period of 24 months, ending on February 25, 2023, with specific

terms and conditions. Judge Feeney also ordered Williams to pay fines and fees, perform 150 hours of public service by February 25, 2022, and complete 4 hours of continuing legal education on legal ethics.

¶ 53        On February 15, 2023, 10 days before attorney Williams's term of probation was scheduled to end and 6 days after Judge Feeney had granted defendant a new trial in this case, the Woodford County State's Attorney's Office filed a petition to revoke attorney Williams's probation, alleging she had violated her probation by "[c]onsuming alcohol on or about February 10, 2023." Attorney Williams was given notice to appear on March 17, 2023. Judge Feeney presided over the March 17, 2023, hearing on the State's petition to revoke attorney Williams's probation on March 17, 2023.

¶ 54        On June 13, 2023, the State filed a supplemental petition to revoke attorney Williams's probation, indicating Williams had also consumed alcohol on or about February 15, 2023, which was the day the State filed the initial petition to revoke.

¶ 55        As noted above, the State's petition to revoke attorney Williams's probation was still pending when the certified record was prepared for this court on March 1, 2024.

¶ 56                        3. *Per Se Conflict of Interest*

¶ 57        A *per se* conflict exists when specific facts about the defense attorney's *status* creates a disabling conflict. *Yost*, 2021 IL 126187, ¶ 39. If a *per se* conflict exists, a defendant does not have to establish her counsel's performance was affected by the conflict nor show she suffered actual prejudice. *Id.* Instead, when a *per se* conflict exists, a defendant's conviction must be automatically reversed, unless the defendant waived his right to conflict-free counsel. *Id.* (citing *Green*, 2020 IL 125005, ¶ 24). "[A] waiver of an existing conflict of interest is not valid unless the defendant is admonished regarding the existence and the significance of the conflict, *i.e.*, the

waiver must be made knowingly." *People v. Poole*, 2015 IL App (4th) 130847, ¶ 34.

¶ 58          Under current Illinois law, attorney Williams had a *per se* conflict of interest in this case because the same state's attorney's office was attempting to revoke her second-chance felony probation while simultaneously prosecuting her client. As a result, attorney Williams and the Woodford County State's Attorney's Office had a contemporaneous connection after the State filed a petition to revoke attorney Williams's probation. This contemporaneous connection lasted throughout the remainder of the trial court proceedings in defendant's case. From our review, the record does not reflect that defendant was ever admonished regarding the existence and significance of the conflict. As a result, the record does not reflect that defendant made a knowing waiver of her attorney's *per se* conflict of interest.

¶ 59          Because we have determined attorney Williams had a *per se* conflict of interest after the State filed the petition to revoke her probation, defendant does not have to show attorney Williams's representation was affected by the conflict or that defendant suffered any prejudice. Regardless, based on what happened in this case after the Woodford County State's Attorney's Office filed a petition to revoke attorney Williams's probation, just six days after she was successful in obtaining defendant a new trial, we think it is important to discuss the specific details about what occurred as a reminder to both judges and attorneys of the problems that can occur and the impact those problems can have on the proceedings when attorney conflicts go unreported or unnoticed.

¶ 60          Based on the record in this case, it is apparent attorney Williams believed her representation of defendant would be and *was* affected by the state's attorney's office petitioning to revoke her probation. In her amended motion to substitute Judge Feeney for cause, attorney Williams stated the petition to revoke compromised both (1) her ability to fully represent defendant

and (2) her "relationship *** in this particular court." Considering the timing of the State's petition, any reasonable attorney in her position would have come to the same conclusion.

¶ 61        From our review of the record, attorney Williams was going to great lengths to withdraw from this case without telling Judge Feeney that the State had filed a petition to revoke her probation and she had a conflict of interest because she did not want Judge Feeney to blame her for the continuances that would be necessary for a new attorney to prepare to represent defendant during her second trial. We presume—or at least hope—Judge Feeney would have granted defendant's request for a new attorney if he had been made aware the State filed a petition to revoke attorney Williams's probation six days after defendant was granted a new trial, regardless of the delays it would cause in retrying defendant. We note the record contains no indication Judge Feeney was aware the petition to revoke was filed and had been noticed up before him prior to the March 17, 2023, hearing.

¶ 62        However, based on Judge Feeney's earlier comments in this case, any attorney in a position similar to attorney Williams's would not want to be seen by Judge Feeney as a cause for delaying defendant's retrial. After Judge Feeney granted defendant's request for a new trial, he indicated he did not want any delays before defendant was retried and stated the case was going on the court's February 27, 2023, jury calendar and a pretrial hearing would be held on either February 15 or February 17, 2023. When attorney Williams indicated she had a scheduling conflict on February 17 but the February 15 date might work, Judge Feeney responded, "One of them is going to work, right? Because it's going to happen."

¶ 63        Then, in response to attorney Williams's request to step out and call someone, presumably to check her calendar, Judge Feeney responded, "Very very quickly. Like, super quick. We will be in recess." When attorney Williams returned, the pretrial hearing was set for 10:30 a.m.

on February 15. Regarding the timing of the second trial, attorney Williams told Judge Feeney that she had a jury trial in La Salle County on February 27. In response, Judge Feeney told attorney Williams:

> "I'm not going to listen to any continuances. This case is going to take priority. So I'm not—just—I don't—move your mountains, do whatever you need to do. This is a very serious case, your client has been in custody a long time, and this case is going forward. If you need a—as you know, I do a rolling calendar, so that's why I said I'm going to set aside time the following week if need be. So if you can try a case earlier in La Salle County, or wherever, that's fine. But in that week to the week[-]and-a-half time frame this case is going. Okay?"

Attorney Williams told Judge Feeney she had just attempted to get out of the La Salle County case, but the trial court in that case had denied her request. She told Judge Feeney she could do the trial the week following the week of February 27. The court indicated they would talk about that further at the pretrial hearing on February 15.

¶ 64 Before that February 15, 2023, hearing, attorney Williams filed a motion to substitute Judge Feeney for cause pursuant to section 114-5(d) of the Code (725 ILCS 5/114-5(d) (West 2022)) on February 14, 2023, alleging, among other things, that Judge Feeney had a predisposition toward defendant's guilt and had precommitted himself to the incorrect legal conclusion that suicidal intent *ipso facto* proves homicidal intent. Attorney Williams argued that Judge Feeney would likely inject these same errors into defendant's new trial. On February 15, 2023, at 8:33 a.m., attorney Williams filed an amended motion for substitution of judge, pursuant to the same section of the Code. It appears the amended motion did not raise any new issues. The case was then transferred to Judge Stroh to hear the motion. That same day, the State filed its

petition to revoke attorney Williams's probation because Williams allegedly consumed alcohol on or about February 10, 2023.

¶ 65    On February 21, 2023, attorney Williams amended her motion to substitute Judge Feeney for cause, adding the following argument:

> "Counsel notes that she is defendant on probation under direct supervision of this very judge who sentenced her on 2/25/21. A petition to revoke was filed on [February 15, 2023]. 20[-]CF[-]89. At best, it compromises the relationship of this lawyer in this particular court. My ability to fully represent my client seems compromised. Although the matter was fully disclosed to client, I do not want to create an unnecessary error."

Two days later, on February 23, 2023, when the hearing on defendant's motion to substitute Judge Feeney was scheduled, attorney Williams filed a motion to withdraw as counsel pursuant to Illinois Supreme Court Rule 13 (eff. Jan. 1, 2023) without any explanation for the request.

¶ 66    At the hearing before Judge Stroh on February 23, 2023, attorney Williams asked Judge Stroh to first address her motion to withdraw as defense counsel before hearing arguments on defendant's motions to substitute Judge Feeney for cause. When Judge Stroh indicated he did not have the authority to consider attorney Williams's motion to withdraw as defendant's counsel, attorney Williams moved to withdraw the motions to substitute Judge Feeney for cause without explanation. When Judge Stroh asked defendant whether she wanted to withdraw the motions to substitute Judge Feeney for cause, defendant initially said she would go along with attorney Williams's request. However, upon further explanation by Judge Stroh, defendant said she did not want to withdraw the motions. Defendant eventually relented and said she was okay with withdrawing the motions to substitute Judge Feeney for cause.

¶ 67 The record on its face does not provide any clear explanation why attorney Williams suddenly wanted to withdraw the motions to substitute Judge Feeney for cause. However, after the State filed the petition to revoke attorney Williams's probation, a reasonable explanation is that attorney Williams thought proceeding on the motions could negatively impact her own personal situation in the revocation proceedings. We note the record is devoid of any order memorializing Judge Stroh's ruling on defendant's motion to withdraw the motions to substitute Judge Feeney for cause.

¶ 68 When the case was transferred back to Judge Feeney, attorney Williams went forward with her motion to withdraw from the case. When Judge Feeney asked why she needed to withdraw, she did not mention she was on probation, the State had filed a petition to revoke her probation, and/or she did not feel like she could effectively represent defendant as a result—even though she had made that assertion in the motion to substitute Judge Feeney for cause. In addition, attorney Williams did not tell Judge Feeney that he would likely be presiding over the probation revocation proceedings in her own criminal case. Further, she did not tell Judge Feeney that if Judge Feeney revoked her probation, he would be resentencing her on a felony charge.

¶ 69 Instead, attorney Williams only said she and defendant had a breakdown in communication and she believed defendant would be better served by a public defender. Although Judge Feeney indicated he knew attorney Williams had filed multiple motions to substitute him for cause, which he indicated was a "very serious" thing to do, the record does not indicate Judge Feeney read or reviewed the content of those motions. Judge Feeney then denied her request to withdraw as defense counsel.

¶ 70 After Judge Feeney indicated the trial court would be in recess, the court overheard attorney Williams make a comment and asked what she had said. Attorney Williams responded,

"I said it's special Maureen Williams' treatment." In response to a question from the court as to why she made that comment, attorney Williams responded, "Your Honor, I have never heard of a situation where a person has asked to be off a case because the client wants me to be—and then, you know, the review that was posted right after the last trial scared her to death." The judge indicated the Internet criticism was "garbage," challenged attorney Williams to point to one time where he had not treated her appropriately, and indicated he resented attorney Williams "making these chide little remarks that are demeaning to me and the court," noting the comments were inappropriate and unprofessional. Attorney Williams apologized, indicating she did not intend for the court to hear her comment. However, she still told the court, "I think my client would be better off with the public defender in this county, and I think she believes that." Judge Feeney responded: "Well, I—she has hired you. You have taken her money, and you have committed yourself to this case, and I'm not—and none of that excuses you making those remarks leaving this hollowed [*sic*] space."

¶ 71 Even after Judge Feeney denied her motion to withdraw as defense counsel and overheard attorney Williams complain the trial court's decision was typical Maureen Williams treatment, she still failed to tell Judge Feeney that she was on felony probation, the Woodford County State's Attorney's Office was trying to revoke her probation, and Judge Feeney likely would preside over the revocation proceedings. If attorney Williams believed defendant would be better represented by a public defender than by her in Woodford County and that her ability to fully represent defendant was compromised by the petition to revoke her probation, it makes no sense why she would not argue these points to Judge Feeney, unless she was concerned her own personal situation would be negatively affected if she did so.

¶ 72 Defendant's sentencing hearing was held five days after Judge Feeney presided

over a hearing on the State's petition to revoke attorney Williams's probation. Our review of the record indicates attorney Williams's performance at defendant's sentencing hearing was clearly affected by the conflict of interest. At the sentencing hearing, although defendant was young, had mental health issues, and attorney Williams had argued defendant should be allowed to present expert testimony at her trial explaining the impact of defendant's mental health on her state of mind at the time of the offense, attorney Williams inexplicably failed to present any evidence in mitigation on defendant's behalf. In addition, attorney Williams told Judge Feeney she did not believe "anything I say is going to influence the court." Finally, after Judge Feeney sentenced defendant to 30 years in prison, attorney Williams failed to file a motion to reconsider defendant's sentence, stating defendant did not intend to challenge her sentence. Once again, it is difficult to reach any rational explanation for attorney Williams's actions, except for a possible personal desire to neither anger nor aggravate the Woodford County State's Attorney's Office or Judge Feeney.

¶ 73 Unfortunately, because no one brought the State's filing of the petition to revoke to Judge Feeney's attention and Judge Feeney did not recognize the potential problems in this case when attorney Williams entered her appearance for defendant, the trial court never admonished defendant about the potential for a conflict at the beginning of the case or that a *per se* conflict was present once the State filed the petition to revoke. As a result, defendant did not make a knowing waiver of his right to conflict-free counsel. Accordingly, we must reverse defendant's conviction and remand this case for a new trial.

¶ 74 4. *The Importance of Identifying Potential Conflicts Early in a Case*

¶ 75 We note the facts of this case do not require this court to address whether attorney Williams had a *per se* conflict of interest at the time she commenced her initial representation of defendant because she was on probation and potentially subject to the Woodford County State's

Attorney's Office filing a petition to revoke her probation. However, we would be remiss if we did not suggest attorney Williams—as soon as possible after agreeing to represent defendant in this case—should have disclosed to the trial court that her representation of a criminal defendant in Woodford County, while she was on probation, created the potential she might not be able to provide the defendant with conflict-free representation during the entirety of the defendant's case. She should have realized her representation of a defendant in a Woodford County criminal case could be impacted if the State filed a petition to revoke her probation. When attorney Williams entered her appearance in this case, she should have asked Judge Feeney to admonish defendant about the situation and the significance of the situation so defendant could make a knowing waiver or obtain a different attorney.

¶ 76        Regardless of attorney Williams's failure to do so, the Woodford County State's Attorney's Office also could have informed Judge Feeney of the potential problems attorney Williams's representation of defendant could cause because she was on probation and potentially subject to the Woodford County State's Attorney's Office filing a petition to revoke her probation. The State could have asked the trial court to admonish defendant and obtain a knowing waiver or require defendant to use a different attorney.

¶ 77        Finally, considering Judge Feeney presided over attorney Williams's case, accepted her guilty plea, and sentenced her to a two-year term of probation, Judge Feeney ideally would have recognized and raised the potential problems that might arise because attorney Williams was on probation in Woodford County, especially if the Woodford County State's Attorney's Office moved to revoke her probation while her client was being prosecuted by the same office. Had he raised the potential for conflict problems in this case, he could have admonished defendant and obtained either a knowing waiver or required defendant to use a different attorney.

¶ 78       The attorneys had a multitude of opportunities to advise the trial court of the potential conflicts in this case before defendant's first trial. It is important for attorneys and trial courts not to be reluctant about addressing potential conflicts at the earliest opportunity. When a potential conflict is disclosed, the trial court then has the opportunity to admonish the defendant of the potential conflict and the significance of the potential conflict. The defendant can then either make a knowing waiver of his right to conflict-free counsel or use a different attorney. Early identification of conflicts fosters transparency in the judicial system, increases the public's confidence in the legal system, and preserves judicial resources.

¶ 79                                B. Other Issues

¶ 80       Because the State presented evidence sufficient to support defendant's conviction, defendant's retrial is not barred by double jeopardy. *People v. Brown*, 363 Ill. App. 3d 838, 850-51 (2005). On remand, the trial court shall appoint new counsel for defendant unless defendant chooses to hire new private counsel. Because we are reversing and remanding for further proceedings, we need not address the other issues defendant raised on appeal.

¶ 81                                III. CONCLUSION

¶ 82       For the reasons stated, we reverse defendant's conviction and remand for further proceedings.

¶ 83       Reversed and remanded.

*People v. Nodine*, 2024 IL App (4th) 230269

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Woodford County, No. 21-CF-195; the Hon. Charles M. Feeney III, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Manuela Hernandez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Gregory Minger, State's Attorney, of Eureka (Patrick Delfino, David J. Robinson, and Courtney M. O'Connor, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |